1
2
3            **UNITED STATES DISTRICT COURT**
4            **DISTRICT OF NEVADA**
5    RONALD LAWRENCE MORTENSEN,          Case No. 2:11-cv-00266-KJD-DJA
6                              Petitioner,
7         v.                                    **ORDER**
8    JEREMY BEAN, *et al.*,
9                              Respondents.
10

11   **I.    Summary**

12        Petitioner Ronald Lawrence Mortensen, a Nevada prisoner, filed a counseled Fourth

13   Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition" (ECF No.

14   176)). For the reasons discussed below, the Court grants a conditional writ of habeas corpus for

15   Grounds I and II(A) of the Petition and denies all other grounds of the Petition.

16   **II.   Factual Background[1]**

17        **A.    The Shooting and Mortensen's Arrest**

18        After midnight on Friday, December 28, 1996, Las Vegas Metropolitan Police Department

19   ("Metro") off-duty officers, Mortensen and Christopher Patrick Brady, left a Las Vegas restaurant

20   en route to a pub. ECF Nos. 29-2 at 16–19, 30–35; 32 at 37. Mortensen was 31 years old, and

21   Brady was only 24; however, Brady was the senior officer. ECF Nos. 21-4 at 14–15; 68-2 at 3, 11.

22   Brady drove a 1974 blue Dodge pickup truck with Mortensen as passenger. ECF No. 29-2 at 38.

23   The truck had tinted windows except for the front windshield. ECF No. 30 at 36. Brady had his

24   off-duty Taurus firearm in the bottom front right pocket of his coat. ECF No. 30 at 1. Mortensen

25

26   ───────────────
          [1] The Court summarizes the relevant state court record for consideration of the issues. The Court makes no
27   credibility findings or factual findings regarding the truth or falsity of evidence or statements of fact in the state court.
     The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made
28   in describing statements, testimony, or other evidence in the state court, constitutes a finding by the Court. Failure to
     mention a category or piece of evidence does not signify it was overlooked in considering the claims.

testified he placed his off-duty Sig Sauer firearm on the truck's bench seat under his left hip. ECF No. 21-4 at 14–15, 25. Mortensen is right-handed. ECF No. 30 at 1–2. Brady testified that he and Mortensen were legally drunk. *Id.* at 18–19.

### 1. Brady's Version of Events

Brady testified that he was driving "recklessly" using the truck "to accelerate, do 180's at certain points, cut through alleys and just drive around and basically mess around" and that he and Mortensen "thought they could get away with harassing" "the bangers and the dopers and the people in the neighborhood" because they were "nasty people." ECF Nos. 29-2 at 39; 30 at 18–19; 32 at 46. He said he pulled into a 7-Eleven parking lot and they purposely harassed a man who was using a telephone by staring at him until the man "got nervous." ECF No. 29-2 at 39–41. Thereafter, Brady continued to drive recklessly and "passed a group of people real fast and real close." *Id.* at 42.

Brady testified that, while he drove down the street, Mortensen told him, "Stop. Pull in the alley," and when Brady did so, he saw men outside an apartment building and two people inside a vehicle. *Id.* at 44–45. Brady said one man stood next to a Thunderbird vehicle and Brady saw that man walk around the back of the Thunderbird "kind of slumped over or leaning forward" and walk into the blind spot of his truck. *Id.* at 46–47.

Brady testified Mortensen did not say anything to the people outside. ECF No. 30 at 15. Brady said Mortensen drew his firearm and "stuck" it out the passenger window, prompting Brady to think there was a threat, and then Brady drew his firearm out of his pocket, stuffed it across Mortensen's chest, and pointed it out the passenger window in the direction of the people outside. ECF Nos. 29-2 at 47–48; 30 at 1. Brady testified his gun was in front of Mortensen's chest in the center under Mortensen's head, about six inches from Mortensen. ECF No. 30-2 at 24–25.

Brady admitted he initially told the police and the grand jury that he "stuck his weapon out the window," but at trial, he claimed he did not stick his arm or weapon out the window; he merely pointed his gun out the window. ECF Nos. 29-2 at 47–48; 30-1 at 13–14; 30-2 at 22–23. Brady's truck had "a bench seat that had two independent chairs for the passenger and also the driver, and a center console seat . . . that folded down and also had a compartment under that middle seat."

ECF No. 29-2 at 24. Brady agreed it was possible for him to have pointed his firearm out the passenger window if the center console for his truck seat was up; however, because he claimed the console was down at the time of the shooting, it was not possible to have done so. ECF Nos. 29-2 at 48; 30 at 15–16; 30-2 at 17.

Brady testified that he realized there was no threat, and dropped his gun, and drove away as Mortensen fired shots. ECF No. 30 at 3–4. After fleeing the scene, Brady asked Mortensen why he fired the shots, and Mortensen said he shot at trees and the building. ECF No. 176-7 at 162.

Brady testified that the next morning, he found Mortensen's firearm sitting on Brady's rain jacket behind the passenger seat of the truck. ECF No. 30 at 23–24. Brady took the gun inside his apartment, "cleared it" by taking the round out of the chamber, and placed the gun, magazine, and round, in his bathroom cabinet. *Id.* at 23–26. Mortensen claimed Brady called him that morning between 10 and 12 and said they partied like "Vikings," and Brady had a great time the night before but never mentioned anything about the shooting; however, Brady denied he made any calls to Mortensen that day. ECF Nos. 30 at 24–25; 32-1 at 23–24.

On Saturday evening, Brady saw a news report that Daniel Mendoza was fatally shot during the incident and the suspects were two white males in a green or blue pickup truck. ECF No. 30 at 26–27. Brady got "very shook up," "very sick" to his stomach, vomited in the bathroom, and "went in the bedroom and laid in the bedroom all night." *Id.*

Brady testified that he telephoned Mortensen Sunday morning and told Mortensen that Mortensen "shot the guy," and that Mortensen initially denied it, but said he was "sorry." ECF No. 30 at 27–28. Brady suggested telling their supervisor, but Mortensen said "no" because he wanted time to think about it. *Id.* at 28–29. Mortensen asked if he could go to Brady's apartment, and Brady realized he was a witness, had Mortensen's firearm, and did not trust Mortensen, so he told Mortensen, "No," however, they agreed Mortensen would pick up Brady at Brady's apartment before their shift that night because Brady did not want to be seen driving his truck. *Id.* at 29–30.

Brady claimed that, because Mortensen did not want to come forward, Brady contacted his father, Mike Brady, who was a Metro officer since 1969. ECF Nos. 29-2 at 16; 30 at 30. Brady's

father went to Brady's apartment at 5:00 p.m., donned gloves, and placed Mortensen's gun into a bag to take to the police station. ECF No. 30 at 30–31.

### 2.    Mortensen's Version of Events

Mortensen testified that on their way to the pub, they stopped to withdraw cash at an automatic teller machine and then stopped at a gas station. ECF Nos. 32 at 43, 46; 32-1 at 1–3. Mortensen told Brady he was not feeling well and wanted to call it a night, but Brady responded, "sarcastically with a 'whatever,'" and said, "Hey, Dude, I got an idea," "Let's go harass some Mary Nora Scrote"[2] and hit Mortensen in the shoulder with a club as if handing it to him. ECF No. 32-1 at 4–5. Mortensen thought Brady was "joking around." *Id.* at 6. Mortensen told Brady to "quit screwing around" and he wanted to "head in," but Brady replied, "You're not going home yet . . . We are going to go to the bar and do some drinking . . . But first I want to trip something out." *Id.* Brady drove "erratically," and fast through an apartment complex and then to a cul de sac where he looked between buildings. *Id.* at 6–8. Mortensen and Brady laughed at Brady's driving, and Mortensen asked where they were going, but Brady said, "Dude, hold on." *Id.*

Mortensen said Brady left the cul de sac, "cut the corner which would be against your oncoming lane," into an alley, and said, "Ah-ha. Look what we got here." *Id.* at 8–9. Brady told Mortensen to roll down the passenger window, and Brady called out to people outside, "Hey, come here." *Id.* at 9–11. Mortensen said he told Brady "Come on, Chris. Let's go. This is stupid," and the next thing he knew, Brady told him, "Look out," and "came across the seat," elbowed Mortensen's chest, "put his arm out the window," "fired one shot," "laughed," then fired three more shots, and said, "Run. You better run." *Id.* at 11–12. Mortensen claimed he tried to stop Brady from firing, but Brady told Mortensen to let go. *Id.* Mortensen said Brady jumped back into the driver's seat and drove to the pub. *Id.*

On the way to the pub, Mortensen asked Brady why he shot the gun and Brady replied, "The son-of-a-bitch had a gun and you just sat there," and Mortensen told Brady he did not see a

---

[2] Mortensen explained, "I know Scrote is a derogatory term some officers use to describe bad people." ECF No. 32-1 at 4–5. He explained that "Mary Nora is a sector beat." *Id.*

gun. *Id.* at 12–13. Mortensen testified that Brady said he "shot into the air" and "Dude, nobody comes upon me like that. I was just trying to scare him." *Id.*

Mortensen testified he then noticed Brady had Mortensen's firearm "between his legs in his crotch area." *Id.* Mortensen said he asked Brady why he used Mortensen's gun, and Brady replied that he could not get to his gun. *Id.* Mortensen said Brady told him, "I hope you don't plan on keeping this gun. I am going to get rid of it" and Mortensen told Brady "You are crazy." *Id.* at 14. Mortensen explained that there is a hidden compartment in the center console. *Id.* Mortensen said Brady "picked up on a center section of the seat and hid the gun. He pulled the center section down over the top of it, pulled his armrest over the top." *Id.*

Mortensen testified that he asked Brady why he conducted the shooting and Brady told him, "I told you I was an evil man. I am evil," and "Dude, don't worry about it" *Id.* at 15–16. Mortensen said he told Brady he was worried about it as he was on probation with the police department and had a wife and child to support, but Brady made faces at him and said, "It is just going to come out a 434 call." *Id.*

At the pub, Mortensen was scared, Brady could see he was worried, and Brady told Mortensen to "act natural" and he didn't want anybody to suspect anything. *Id.* at 18. Officer Anthony John Bongiovani testified he saw Mortensen at the pub and heard him say he was going to quit Metro. ECF No. 29-1 at 34–36. After an hour and a half, Mortensen and Brady left the pub, Mortensen vomited in the parking lot of the pub before they left and a second time in an office complex, and then Brady drove Mortensen home. ECF No. 32-1 at 19–20.

Mortensen testified that he asked Brady about his gun, but Brady would not let him have it. *Id.* at 21. He said Brady told him, "Don't worry about it right now," and when Mortensen reached for it into the compartment, Brady "put his elbow on the cupholder" and said, "Don't worry about it right now." *Id.* Mortensen was sick, drunk, and bewildered about the shooting, and had no idea anyone had been harmed or killed. *Id.* at 22. The next morning, Mortensen vomited until he had dry heaves and then spent the rest of the day sick. *Id.* at 22–23, 25.

Mortensen said Brady informed him about the killing on Sunday morning, and when Brady insisted that he was not going to prison for something he "didn't do," Mortensen asked him, "what

do you mean didn't do?" *Id.* at 26–28. Mortensen said Brady claimed he was "just screwing around," "it was an accident," and speculated the shots "ricocheted and hit somebody" and when Mortensen said his main concern was his family and he had told Brady that, Brady said he was "sorry." *Id.* 28–29.

Mortensen testified he knew they were going to be fired and go to jail, and that he and Brady discussed reporting it to their acting supervisor, Lieutenant Schofield. *Id.* at 30, 32. Mortensen said they agreed he would pick up Brady at his apartment at 6:00 p.m. before their shift that night, and it was Mortensen's understanding they would "go in together and report this incident." *Id.* at 29–31. Mortensen said Brady told him not to do or say anything without him or before coming over to Brady's house. *Id.*

When Mortensen arrived at Brady's apartment, he saw Brady's father, and when he called Brady's apartment, he was told Brady was not there. *Id.* at 32–35. Mortensen thought it was possible Brady was not going to report the incident with him and that he was "being set up" to take the blame for the shooting. *Id.* Mortensen went to tell his grandmother goodbye, met with his father-in-law, who agreed that Mortensen had to report the incident, and then Mortensen reported for work where he was arrested before he reported the incident. *Id.* at 36–38.

### 3.    Metro Investigation

#### a.    Brady identified Mortensen as the shooter.

On the evening of Sunday, December 29, 1996, Brady's father called Metro Lieutenant Wayne Petersen, head of homicide. ECF No. 29 at 30–33. Brady's father knew Petersen but did not work or socialize with him. *Id.* Brady's father told Peterson his son was the driver involved in the Mendoza shooting and Petersen agreed to meet them at the police station. *Id.* at 33–34.

At the station, Brady's father gave the Sig Sauer firearm to Metro Sergeant Kevin L. Manning, who gave it to Metro Detective Brent Becker. *Id.* at 12. Detective Becker knew Brady's father because they conducted surveillance together in 1990. ECF No. 28-1 at 43. Becker identified Mortensen as the registered owner of the Sig Sauer. ECF No. 29 at 13.

Homicide Detectives Becker and Paul Bigham conducted a recorded interview with Brady and Brady identified Mortensen as the shooter. ECF No. 28-1 at 37, 44–47. Brady was crying,

"looked like hell" and "looked like he had been up all night." *Id.* Brady's father was present during the interview because Detective Becker "felt Mike Brady would give some sort of support to [Brady]" so they could get an interview out of him, but no lawyer was present. *Id.* Becker advised Brady of his *Miranda* rights, but Brady did not invoke them. *Id.* No immunity or promises were made to Brady or his father. *Id.* Brady was interviewed for 18 minutes and never interviewed again. ECF No. 28-2 at 28–31.

Detectives Becker and Bigham told Metro Sergeant Manning they wished to conduct a "walk-through booking"[3] with Brady on a possible charge of accessory. ECF No. 29 at 16–17. Manning suggested, with the concurrence of Lieutenant Petersen and Metro Deputy Chief Karl Edwards, that they submit the decision to the District Attorney because Brady "came voluntarily" and was "essentially a witness for our case." *Id.* at 17–18. Manning explained that the decision was based on the information provided by Brady and information gathered at the scene, which corroborated Brady's statement and was sufficient to believe Mortensen was responsible for the shooting. *Id.* at 24, 27–28. Brady never faced charges.

### b. Metro investigated the Sig Sauer and truck.

In the early morning of Monday, December 30, 1996, Metro Crime Scene Analyst Daniel Ford processed and photographed Brady's truck. ECF Nos. 26-1 at 25; 26-2 at 28–29; 30 at 32–33. Ford was instructed by a homicide detective to process only the passenger side of the truck. *Id.* The truck was returned to Brady a day or two later. ECF No. 30 at 33–34.

Metro Forensic analysis confirmed the Sig Sauer was responsible for six cartridge cases, a bullet in the laundry room door of the apartment building, a bullet fragment, and a bullet jacket, found at the scene. ECF No. 31-1 at 1–8. Mortensen's left middle fingerprint was on the slide of the Sig Sauer, but Brady's fingerprints were not on the firearm. ECF No. 31-3 at 29–30, 38. An expert testified Mortensen's fingerprints would not have been disturbed by Brady clearing the weapon, handling the grip, and pulling back the slide. *Id.* at 31–32.

---

[3] Sergeant Manning explained that a "walk-through booking" "just means he doesn't have to spend time in custody. He would do all the paperwork essentially for the booking, then he would be released on probably an O.R. [own recognizance]." ECF No. 29 at 23.

### 4.    Eyewitnesses testified the passenger, Mortensen, was the shooter.

#### a.    Lujan

Andrea Lujan testified she was in the passenger seat of a car with Luis Ramon Martinez at the time of the shooting. ECF No. 27 at 36–37. She estimated she was about 20 feet away from the truck and could see "there was a driver and passenger. There was nobody in the middle and nobody in the back." *Id.* at 42. She said the driver was "acting normal" and behind the steering wheel but also said she did not pay attention. *Id.* Lujan said she did not see the passenger's shoulders turned. *Id.* at 45. Lujan saw Rodriguez talking to the passenger and walk toward the truck, and then a "gun come out" on "the passenger side." *Id.* at 38, 44.

Lujan testified she "would say it was the passenger" holding the gun "because it wasn't—I didn't see nobody's arm go over—like I see it come right—here is the window and I seen it come out right there. I didn't see nobody's arm reach over," and although she stated she was "sure it was the passenger," she also stated she was uncertain. ECF Nos. 27 at 44; 27-1 at 2–3. Lujan thought the passenger held the gun because "[she] didn't see nobody's hand coming over like that. And the driver was just sitting there calm. I mean, he was just relaxed, facing this way. That I saw." ECF No. 27-1 at 11–12. She admitted she could not see the driver's hands on the wheel. *Id.*

#### b.    Martinez

Eyewitness Luis Ramon Martinez was an admitted 18th Street gang member. ECF No. 26-3 at 1. He viewed a photographic lineup array on December 30, 1996, and selected Mortensen's photograph as the passenger; however, the next day, he viewed a physical lineup where he failed to select Mortensen. ECF Nos. 26-3 at 25–29; 26-4 at 23.

Martinez testified he was in a vehicle about 50 to 60 feet away and could not see how many people were inside the truck, but he saw the passenger and the passenger truck window rolled down. ECF Nos. 26-3 at 5–8, 34; 26-4 at 3–5. When asked if he could see the driver, he replied, "no, not that good," and explained the light was brighter on the passenger side and "terrible" as there was no light on the driver's side. *Id.* Martinez said only two to three seconds passed between the time the truck stopped and the passenger window rolled down, and another four to five seconds passed before Martinez saw a gun. ECF No. 26-4 at 16.

Martinez testified he saw only one gun and he did not see the driver lean across the passenger. *Id.* at 3–4. Martinez testified the passenger stuck his head out the window and pointed the gun out the window while holding the gun with two hands. ECF No. 26-3 at 8, 16–17. Martinez said the passenger shot the gun "because he was the one stuck the gun out." *Id.* at 34.

### c.    Ramirez

Eyewitness Ruben Ramirez testified he was an 18th Street gang member. ECF No. 27 at 17. He was unable to identify Mortensen in a photographic lineup array on December 30, 1996; however, after having seen Mortensen's photograph in the array, he identified Mortensen in a physical lineup the next day, and at trial, he identified Mortensen as the shooter. ECF Nos. 26-4 at 33; 27 at 10, 29–32.

Ramirez testified the truck stopped about 35 to 40 feet away from him. ECF No. 26-4 at 30–31. He saw two people in the truck but could not see the driver clearly because the lighting was better on the passenger side and Mortensen was turned and blocked Ramirez's view of the driver. ECF Nos. 26-4 at 32–33; 27 at 26–27. Ramirez said Mortensen "signaled" to come closer and fired a gun from the window without taking "time pointing," and fired "towards many directions." ECF No. 27 at 35, 39, 42.

Ramirez testified it was impossible for the driver to have fired the gun "because [the passenger] had the gun in his hand. *Id.* at 15, 27. The trial record of Ramirez's testimony fails to clarify whether Ramirez claimed the gun was in Mortensen's left or right hand.[4] *Id.* Ramirez said Mortensen cocked the gun, but Ramirez did not "know if he had it in the air or where" although

---

[4] The record is unclear whether Ramirez claimed Mortensen had the gun in his right or left hand:

THE COURT:     Do you know how he pulled out the gun?
THE WITNESS: Just with his hands. I didn't see where he had it, but I only saw it when he had it in his hand.
(BY DEFENSE COUNSEL):
Q.      You said you saw it in his hand. Was it in his hand or hands?
A.      In his hand. In his hand.
Q.      Which hand?
A.      This hand.
THE COURT:     Right hand?
THE WITNESS: This hand.

ECF No. 27 at 27.

he saw Mortensen "handling it." *Id.* at 43. Ramirez did not see where the gun was kept; he only saw it when it was in Mortensen's hand. *Id.* Ramirez said that as far as he knew, only the passenger fired shots as he did not see the driver with a gun and saw only one gun. *Id.* at 40–42. Ramirez agreed there was no question in his mind who fired the gun because he saw him. *Id.* at 15.

### d.    Rodriguez

Eyewitness Eduardo Rodriguez was shown a photographic lineup on January 14, 1997, but was unable to make an identification. ECF No. 27-1 at 38. He testified he had a 40-ounce beer in his hand and saw two people in the truck. *Id.* at 18, 25. The light was bright on the passenger and there was a big light on the driver's side. *Id.* at 20. He paid no attention to the driver because the passenger was attracting attention. *Id.* at 39. Rodriguez said the passenger "waved over here" to approach him. *Id.* at 19.

Rodriguez testified the passenger leaned "on the door" and without turning his body, pulled out a gun. *Id.* at 21–22. Rodriguez was "positive" the passenger pulled out the gun with his "left hand." *Id.* at 22, 40. Rodriguez said he started to run away and heard, "Hey, where you guys going" and then heard shots. *Id.* at 23. Rodriguez made an in-court identification of Mortensen as the man who shot the gun. *Id.* at 24–25, 31. He said he didn't see the driver do anything and he would have seen it if the driver pulled out a gun. *Id.* at 41.

### e.    Zurita

Rosa Zurita viewed a physical lineup where she failed to identify Mortensen. ECF No. 28 at 34. She testified that on the night of the shooting, she looked out the apartment window after she saw the truck lights and saw the passenger but not the driver. *Id.* at 16–18, 38. She explained "the way the light was, it was shadowed like on the driver's side. You can see everything from the passenger side over to the window." *Id.* She believed the men in the truck were undercover police and told the people in the apartment that "the narcs" were there. *Id.* at 19.

Zurita testified she turned back to look out the window and saw the passenger "lean out" the window, "duck" his head out the window due to his height, and with his head and wrists out the window, he held a gun "out the window on the window . . .." *Id.* at 20–21, 37–38. Zurita said the passenger was turned "toward the side," smiled, laughed, and shot the gun. *Id.* at 21–22, 26.

She said she never saw the driver and never saw a second gun come out the window. *Id.* at 38–39. On cross-examination, Zurita testified that Mortensen's head was outside the truck, his hands were holding the gun in front of his head, and his arms rested on the edge of the window. *Id.* at 37–38.

### III.    Procedural Background

On May 13, 1997, a jury returned a general verdict finding Mortensen guilty of first-degree murder with use of a deadly weapon and imposed a sentence of life imprisonment without the possibility of parole. ECF Nos. 22 at 36; 176-2 at 37.

On June 16, 1997, Mortensen filed the first of three motions for new trial. ECF No. 22-2. In this first motion, he claimed that, although the prosecution disclosed Carye Morris made a sexual assault complaint against Brady,[5] the defense discovered posttrial that Morris would corroborate Mortensen by testifying Brady told her he was "an evil man." ECF No. 22-2 at 19–23. On July 28, 1997, the state district court denied the motion. ECF No. 23 at 12–13, 25.

On July 25, 1997, Mortensen was sentenced to two consecutive terms of life imprisonment without the possibility of parole and judgment was entered. ECF No. 23 at 7–8. He appealed the judgment and the order denying the first motion for a new trial. *Id.* at 14–15.

On August 10, 1998, Mortensen filed a second motion for new trial based on the July 1998 federal grand jury testimony of Metro Officer Mark Barry that Brady had mentioned his desire to conduct drive-by shootings on more than one occasion about a year before the shooting of Mendoza. ECF Nos. 36 at 13; 130-1. The state district court held an evidentiary hearing at which Barry testified and on October 15, 1998, denied the motion. ECF Nos. 36-2 at 9, 13–18; 176-3 at 82–96. On November 3, 1998, Mortensen appealed the denial of that motion. ECF No. 36-2 at 21.

On May 6, 1999, Mortensen filed a third motion for new trial claiming the State failed to disclose the criminal history of eyewitness Ramirez. ECF No. 37-2 at 13. The motion was denied, and Mortensen appealed. ECF Nos. 38 at 35; 38-2 at 6; 176-2 at 11.

On September 27, 1999, the Supreme Court of Nevada ("NSC") affirmed the direct appeal, after consolidating the direct appeal with Mortensen's appeals from the denials of the first and

---

[5] Although the motion claimed the State was tardy in its disclosure of Morris's complaint, the defense did claim a *Brady* due process violation. ECF No. 22-2 at 19–23.

second motions for new trial. ECF Nos. 176-2 at 16–36. The NSC denied Mortensen's petition for rehearing and a remittitur was filed on January 28, 2000. ECF Nos. 38-1 at 24; 38-2 at 12, 19. On October 5, 2001, the NSC affirmed the denial of the third new-trial motion. ECF No. 40 at 34–37.

Meanwhile, on December 13, 2000, Mortensen filed a state habeas petition. ECF No. 40 at 1. Following an evidentiary hearing, the state district court denied Mortensen's petition on April 23, 2008. ECF No. 44 at 4–26. Mortensen appealed, and the NSC affirmed on July 15, 2010. ECF No. 176-2 at 2–10. Mortensen's petitions for rehearing and *en banc* reconsideration were denied and remittitur was filed on December 21, 2010. ECF No. 44-6 at 10–31.

## IV. Governing Legal Standards

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of the Petition:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, under § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* at 75 (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

Under 28 U.S.C. § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). AEDPA requires federal courts to "accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "Under § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct,' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Wood*, 558 U.S. at 293.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . .") (internal citations omitted). However, "[e]even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## V. Discussion

### A. Ground I

Mortensen alleges his due process rights were violated because the State was relieved of its burden to prove each element of first-degree murder, i.e., premeditation, deliberation, and willfulness, beyond a reasonable doubt, when the trial court gave a *Kazalyn*[6] instruction, which

---

[6] *Kazalyn v. State*, 108 Nev. 67, 75, 825 P.2d 578, 583 (1992).

permitted the jury to convict him of first-degree murder without finding all three requisite elements. ECF No. 176 at 28. He argues a new trial is warranted because there is cause and prejudice to overcome his procedural default of this claim and the instructional error had a substantial and injurious effect on the determination of the jury's verdict. *Id.* at 31–33. Respondents counter that Mortensen fails to establish cause and prejudice to overcome the default or that the erroneous instruction had a substantial and injurious effect or influence on the determination of the jury's verdict because the defense was not based on a lack of *mens rea*; rather, it was based on the theory that Brady was the shooter. ECF No. 218 at 35–44.

### 1.    Additional Background

The prosecution charged Mortensen with open murder under two theories of liability: (1) first-degree murder having premeditation and deliberation in its commission, and/or (2) second-degree murder by committing an unlawful act or acts, which, in its or their consequences, naturally tends or tend to destroy the life of a human being, to-wit: Defendant aiming and shooting a firearm from a motor vehicle into a group of persons. ECF No. 22 at 3.[7]

The defense argued Brady fired the shots that killed Mendoza. *See, e.g.*, ECF No. 34-1 at 31–32. The State argued to the jury that, at a minimum, it proved second-degree murder by establishing the killing happened in the commission of an unlawful act, i.e., shooting a firearm from a vehicle and shooting a firearm at an occupied building, which in its consequence tends to destroy the life of a human being . . .. ECF No. 34 at 13–18.

Instruction 13 to the jury stated: "Murder of the First Degree is murder which is perpetrated by any kind of willful, deliberate and premeditated killing." ECF No. 176-2 at 51. In closing the State argued "the distinguishing factor between second-degree murder and first-degree murder is the words "premeditation and deliberation." ECF No. 34 at 18. The State argued "the question really is is there premeditation and is there deliberation." *Id.*

---

[7] The State did not allege felony-murder as the predicate felony did not qualify under NRS § 200.030, which at the relevant time stated, "Murder of the first degree is murder which is . . . [c]ommitted in the perpetration or attempted perpetration of sexual assault, kidnaping, arson, robbery, burglary, invasion of the home, [or] sexual abuse of a child or sexual molestation of a child under the age of 14 years . . . .

For the element of premeditation, the State recited Instruction 14 (the *Kazalyn* instruction):

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

ECF No. 176-2 at 52. The State argued, "And I say to you that when an individual takes out a weapon and he fires that weapon after taking it out, drawing, aiming, and putting it center mass on an individual, is that premeditation? Are those successive thoughts of the mind when the gun comes up and it is drawn and it is fired six times? Are those deliberate acts?" ECF No. 34 at 19.

For the element of deliberation, the State argued to the jury, "Now each of you know what the word deliberate means. We won't spend a lot of time[] on that word" and argued "deliberation" was defined in Instruction 10. *Id.* at 19–20. The State read to the jury the first sentence of Instruction 10, which did not define deliberation; rather, it explained express malice: "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." ECF Nos. 34 at 19–20; 176-2 at 48. Instruction 10 further stated, "Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." *Id.*

The State then explained that the jury would have the instructions and argued the State proved premeditation and deliberation and that this was no accidental killing:

> Do we have doubt when we laughingly flag a human being towards the car and when the human being begins to approach and the killer is laughing and smiling as Daniel Mendoza is walking to the car and is the killer's mind functioning as he smiles and summons them as he reaches for his gun and aims that gun and I ask you are those deliberate acts? Are those circumstances that evidence deliberation, a deliberate act or is this all a big accident?
>
> Does one accidentally summon people to a car and as they come do they accidentally begin to laugh and does a gun accidentally subsequently appear in their hand and does that gun accidentally end up focused on a human being's chest and does that gun accidentally fire itself? Or are these deliberate acts at the hands of the killer?
>
> Ladies and gentlemen, I submit to you that there is premeditation. There is successive thoughts of the mind in the conduct of the killer in this case.

And these acts are deliberate. This is a first-degree murder with use of a deadly weapon. And the evidence certainly supports that. You will have those jury instructions to go over.

The real question for you people is not is this voluntary manslaughter or is it involuntary manslaughter. The real question is does the evidence establish deliberate conduct at the hands of a killer and is that conduct premeditated because that is the distinguishing factor between first and second-degree murder.

And I submit to you that the conduct in this case through the evidence in this courtroom is deliberate, premeditated conduct that gives rise to a first-degree murder conviction.

ECF No. 34 at 20–21.

## 2.  *Byford* and the State Court's Determination

On February 28, 2000, before Mortensen's judgment was final,[8] the NSC decided that "[b]y defining only premeditation and failing to provide deliberation with any independent definition, the *Kazalyn* instruction blurs the distinction between first- and second-degree murder." *Byford v. State*, 116 Nev. 215, 235, 994 P.2d 700, 713 (2000). *Byford* set forth the following instruction for trial courts to use in cases where defendants are charged with first-degree murder based on willful, deliberate, and premeditated killing:

Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elements—willfulness, deliberation, and premeditation—must be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder.

Willfulness is the intent to kill. There need be no appreciable space of time between formation of the intent to kill and the act of killing.

Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action.

A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill. [footnote omitted]

Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.

Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

---

[8] ECF No. 38-2 at 19.

> The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.
>
> The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

*Id.* at 236–37, 994 P.2d at 714–15.

On December 13, 2000, Mortensen filed his initial state postconviction review petition claiming that, under *Byford*, the *Kazalyn* instruction had violated his due process rights. ECF No. 40 at 1. In 2010, the NSC determined Mortensen procedurally defaulted his *Byford* claim, failed to establish prejudice to overcome default, and the erroneous instruction was harmless:

> Mortensen claims that the instruction on premeditation and deliberation given at his trial, known as the *Kazalyn*
>
> > [FN1] *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992), *receded from by Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000).
>
> instruction, was improper and warrants a new trial. This claim could have been raised previously and is procedurally barred absent a showing of good cause and prejudice. *See* NRS 34.810(b). We conclude that this court's decision in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000), provided good cause for Mortensen to raise the claim in a first, timely post-conviction petition.
>
> > [FN 2] The parties appear to agree that Mortensen's direct appeal was final at the time *Byford* was decided. However, we denied rehearing of Mortensen's direct appeal on December 27, 1999. Because Mortensen's time for filing a petition for certiorari to the United States Supreme Court had not yet expired, his conviction was not final when *Byford* was decided on February 28, 2000. *See Colwell v. State*, 118 Nev. 807, 820, 59 P.3d 463, 472 (2002) (stating that "[a] conviction becomes final when judgment has been entered, the availability of appeal has been exhausted, and a petition for certiorari to the Supreme Court has been denied or the time for such a petition has expired"); Sup. Ct. R. 13(3) (stating that petition for writ of certiorari to United States Supreme Court must be filed within 90 days after entry of judgment or denial of rehearing). Because Mortensen's convictions were not final when *Byford* was decided, *Byford* applies to him. *Nika v. State*, 124 Nev. ___, ___, 198 P.3d 839, 842 (2008), cert. denied, ___ U.S.___, 130 S. Ct. 414 (2009).
>
> However, we conclude that he failed to show prejudice.
>
> > [FN 3] We also reject Mortensen's claims that trial and appellate counsel were ineffective for failing to challenge this instruction. The instruction was a correct statement of Nevada law until five months after this court affirmed Mortensen's convictions on direct appeal,

17

1

and thus counsel were not unreasonable in failing to challenge it. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).

2

3

4

5

6

7

The defense theory at trial was that Mortensen's companion, Christopher Brady, was the shooter. In order not to undermine this defense, trial counsel made no attempt to challenge the premeditation instruction or otherwise argue that Mortensen lacked the requisite intent for first-degree murder. Furthermore, the evidence presented at trial showed that Mortensen and Brady were driving around and harassing the populace when their truck pulled up near a group of people. Mortensen motioned for the people to approach, brought his weapon out of the window, and fired. In light of this evidence that the murder was premeditated, willful, and deliberate and the fact that the key issue at trial was not intent but the identity of the shooter, we conclude that the erroneous instruction on premeditation and deliberation was harmless. Because Mortensen has not demonstrated prejudice, his claim is procedurally barred.

8

9

ECF No. 44-6 at 3–4.

10

### 3.    Analysis of Ground I

11

Mortensen contends this Court must apply *de novo* review to Ground I because the NSC

12

did not adjudicate the claim on the merits. ECF No. 176 at 33. The NSC's decision demonstrates

13

that it alternatively adjudicated the claim on the merits by concluding "the erroneous instruction

14

on premeditation and deliberation was harmless." *See supra* at p. 18. A state court's "double-

15

barrel[ed]" decision is "entitled to deferential review by federal courts" as to "both its procedural

16

default ruling and its merits ruling." *Apelt v. Ryan*, 878 F.3d 800, 825 (9th Cir. 2017) ("Where a

17

state court expressly invokes a procedural bar, the claim is defaulted, even though the state court

18

goes on to discuss the merits of the claim."). *See also Clabourne v. Ryan*, 745 F.3d 362, 383 (9th

19

Cir. 2014) (holding AEDPA deference applies to "alternative holding on the merits" where state

20

court simultaneously rejected claim on procedural ground). Thus, the Court applies deferential

21

review to the NSC's determinations.

22

### a.    Standards for Evaluating Procedural Default

23

"A federal habeas court generally may consider a state prisoner's federal claim only if he

24

has first presented that claim to the state court in accordance with state procedures." *Shinn v.*

25

*Ramirez*, 596 U.S. 366, 371 (2022). Where a petitioner fails to do so, and "has defaulted his federal

26

claims in state court pursuant to an independent and adequate state procedural rule," "federal

27

habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and

28

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). *See also Robinson v. Ignacio*, 360 F.3d 1044, 1052 n.3 (9th Cir. 2004) (explaining that "Nevada's 'cause and prejudice' analysis and the federal 'cause and prejudice analysis,' are nearly identical").

To demonstrate cause for a procedural default, a petitioner "must establish that some external and objective factor impeded his efforts to comply with the state's procedural rule." *Hiivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The Supreme Court has identified the following nonexclusive "objective impediments to compliance with a procedural rule": (1) interference by officials that makes compliance with the state's procedural rule impractical; (2) a showing that the factual or legal basis for the claim was not reasonably available to counsel; and (3) the procedural default was the result of ineffective assistance of counsel—failing to properly preserve a federal constitutional claim for review in state court. *See Carrier*, 477 U.S. at 488.

### b.    Analysis of Cause to Overcome the Default

The NSC determined its decision in *Byford* "provided good cause for Mortensen to raise the claim in a first, timely post-conviction petition." *See supra* at p. 17. This Court, in ruling on Respondents' motion to dismiss, previously agreed with that determination. ECF No. 212 at 7. (citing *Carrier*, 477 U.S. at 488 (explaining that "a showing that the factual or legal basis for a claim was not reasonably available . . . would constitute cause").

Respondents contend Mortensen failed to show a legal basis for the claim was not reasonably available to counsel. ECF No. 218 at 39. However, the Supreme Court stated in *Carrier* that it did not present an exhaustive catalog of objective impediments to compliance with procedural rules. 477 U.S. at 488 ("Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that 'some interference by officials,' . . . made compliance impracticable, would constitute cause under this standard.") (internal citations omitted) (emphasis added); *see also Smith v. Murray*, 477 U.S. 527, 533–34 (1986)

19

(acknowledging the Court had "declined in the past to essay a comprehensive catalog of the circumstances that would justify a finding of cause.").

Because the Supreme Court has not provided an exhaustive list of objective impediments to compliance with a procedural rule, the NSC's determination that Mortensen established cause for the procedural default is neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, Mortensen has established cause to overcome the default due to the decision in *Byford*.

### c. Analysis of Prejudice to Overcome the Default

To establish prejudice to overcome a procedural default a petitioner "[m]ust show not merely a substantial federal claim, such that 'the errors at . . . trial created a *possibility* of prejudice,' but rather that the constitutional violation 'worked to his *actual* and substantial disadvantage.'" *Shinn*, 596 U.S. at 379–80 (emphasis in original) (citing *Carrier*, 477 U.S. at 494 and quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial." *Carrier*, 477 U.S. at 494. This showing is "a significantly higher hurdle than would exist on direct appeal." *Frady*, 456 U.S. at 166.

In *Frady*, a jury convicted the petitioner of first-degree murder and robbery. 456 U.S. at 156. On collateral review, Frady argued the trial court erred in instructing the jury on the meaning of malice, thereby relieving the prosecution of the burden of proving malice and denying the jury an adequate opportunity to consider a manslaughter verdict. *Id.* at 158, 169. Frady's claim was procedurally defaulted, and the Supreme Court concluded it was unnecessary to determine whether Frady showed cause for the default because it was confident he suffered no actual prejudice. *Id.* at 168. The Supreme Court found that "whatever it may wrongly have believed malice to be, Frady's jury would not have found passion and provocation [necessary for manslaughter], especially since Frady presented no evidence whatever of mitigating circumstances, but instead defended by disclaiming any involvement with the killing." *Id.* at 174. Because there was evidence of malice "aplenty," the Court concluded there was "no substantial likelihood" the same jury that convicted

Frady of first-degree murder would have concluded, if the malice instructions had been better framed, that his crime was only manslaughter. *Id.* at 172, 174.

Mortensen's jury found he was the shooter. Having made that finding, the jury was then tasked with determining whether Mortensen committed the crime with premeditation, deliberation, and willfulness as required for first-degree murder or committed second-degree murder. *See Patterson v. New York*, 432 U.S. 197, 210 (1977) (acknowledging "[D]ue Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."); *In re Winship*, 397 U.S. 358, 364 (1970) ("Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")*. See also, e.g., Riley v. McDaniel*, 786 F.3d 719, 726 (9th Cir. 2015) (rejecting State's argument that *Kazalyn* instructional error was harmless because the defense argued that another person was the shooter, by explaining that "[r]egardless, the state bore the burden of proving each and every *mens rea* element of first-degree murder beyond a reasonable doubt, even though the defense theory of the case did not specifically put those elements at issue.") As the rejection of Mortensen's innocence argument did not relieve the State of its obligation to prove first-degree murder beyond a reasonable doubt or relieve the jury of its responsibility to determine whether the State proved its case, the NSC's determination that Mortensen's defense precluded prejudice for purposes of overcoming the procedural default is objectively unreasonable.

All fairminded jurists would agree the NSC's conclusion that Mortensen failed to establish prejudice to overcome the default based on evidence of premeditation, deliberation, and willfulness, constitutes an objectively unreasonable application of *Frady* to the evidence in Mortensen's case, and that Mortensen has made the requisite showing that the instructional error worked to his actual and substantial disadvantage. *See Frady,* 456 U.S. at 168–69.

The jury received the *Kazalyn* instruction for first-degree murder which informed the jury that it must find premeditation, deliberation, and willfulness, but, according to *Byford*, the instruction defined only premeditation without defining deliberation, and mandated a finding of

first-degree murder if the jury found only premeditation. *See Byford*, 116 Nev. at 236, 994 P.2d at 713–14. In closing, the State argued the element of deliberation was a nonaccidental deliberate act and that Instruction 10 defined the element of deliberation. *See supra* at pp. 15–16. Instruction 10 explains malice, not deliberation. *Id.* Thus, in addition to the misguided *Kazalyn* instruction on the elements of premeditation and deliberation, the State's argument erroneously informed the jury that malice was sufficient to establish deliberation for first-degree murder.

Had the jury instead received the *Byford* instruction, it would have been provided with a far different explanation of the elements of premeditation and deliberation. The jury would have been told that deliberation is "the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action," and "[a] deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur," and that "[a] mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill." *Byford*, 116 Nev. at 236, 994 P.2d at 714.

The evidence at trial established a basis for the jury to draw inferences that Mortensen's actions were the product of an unconsidered and rash impulse without weighing the reasons for and against and without consideration of the consequences of his action. Before the shooting Brady and Mortensen had been drinking and Brady was driving recklessly on their way to a pub. They were each laughing at Brady's reckless driving. According to Brady, they had fun intimidating an individual at a payphone by staring at him, and elsewhere driving past a group of people at a high rate of speed to scare them. Brady said Mortensen directed him to pull into the alley were Mendoza and others were gathered. According to eyewitnesses, the truck stopped, Mortensen laughed while calling out to the people, and motioned for them to approach the truck. Brady, however, testified he did not hear Mortensen call out to the people. The eyewitnesses testified Mortensen fired shots in the direction of the people who, after the first shot, ran away, until Brady stepped on the gas and fled the scene. According to Brady, after he fled the scene, he asked Mortensen why he fired the shots, and Mortensen replied that he was shooting at trees and the building. *See supra* at pp. 2–3,

8–11. Unlike in *Frady*, where the evidence of malice "aplenty" confidently eliminated any substantial probability that the jury, even if properly instructed, would have determined Frady lacked malice to support the first-degree murder conviction, the evidence in Mortensen's case is not so great that it precluded a rational juror's finding that Mortensen acted without deliberation, resulting in a verdict of second-degree murder. *See, e.g.*, *Riley*, 786 F.3d at 725; *Polk v. Sandoval*, 503 F.3d 903, 911–13 (9th Cir. 2007).

For the foregoing reasons, Mortensen has established cause and prejudice to overcome the procedural default of his claim in Ground I.

### d.    Analysis of the Merits

The Court applies deferential review to the NSC's alternative determination on the merits that the instructional error applies to Mortensen and was harmless. *See supra* at pp. 17–18.

A jury instruction error may violate due process if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "'[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right].'" *See id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In evaluating an instructional error claim, the instruction in question "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

The NSC reasonably determined *Byford* applies to Mortensen as the *Kazalyn* instruction violated due process. *See Nika v. State*, 124 Nev. 1272, 1276, 1286 & n.66, 1301, 198 P.3d 839, 842, 849 & n.66, 859 (2008) (holding *Byford* announced a change in law that, under due process, applies to murder convictions not final when *Byford* was decided); *Riley*, 786 F.3d at 724 ("Because Nevada law treated deliberation as a distinct element of first-degree murder at the time Riley was convicted and at the time his conviction became final, the use of the *Kazalyn* instruction at his trial constituted a due process violation under the United States Constitution.").

To merit federal habeas relief, a petitioner must show an instructional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507

U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence," and "[i]f so, *or if one is left in grave* doubt [as to the harmlessness of the error]*, the conviction cannot stand." *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (quoting *Kotteakos*, 328 U.S. at 764–65) (emphasis added).

"When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*, 596 U.S. 118, 122 (2022). Although a federal habeas petitioner must meet the *Brecht* standard, that does not mean the state court's harmlessness determination has no significance. *See Davis v. Ayala,* 576 U.S. 257, 268 (2015). Non-structural trial error of a constitutional dimension raised on direct appeal is subject to the "harmless beyond a reasonable doubt" prejudice standard enunciated in *Chapman v. California*, 386 U.S. 18, 24 (1967), whereas non-constitutional errors are reviewed under the harmless error test set forth in *Kotteakos*, 328 U.S. at 776, i.e., whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *See id.* at 267–68. Thus, where there is a trial error of constitutional dimension, and AEDPA governs, it is a precondition to the application of *Brecht* to the error for federal habeas corpus purposes, that a federal habeas court find, in accordance with AEDPA and where applicable, that the state court's decision applied *Chapman* in an objectively unreasonable manner. *See id.* at 269–70 (citations and quotation marks omitted).

Fairminded jurists would agree the NSC unreasonably applied *Chapman* to the evidence in making its determination that the instructional error was "harmless." As discussed, had the *Byford* instruction been given at trial, a rational juror could have drawn reasonable inferences that Mortensen acted without requisite deliberation for first-degree murder and instead acted on a "mere unconsidered and rash impulse," which the *Byford* instruction states is "not deliberate, even though it includes the intent to kill." *See supra* at pp. 16–17, 20–23. *See also Riley*, 786 F.3d at 726 ("[A] showing that evidence exists which could rationally be viewed as reflecting deliberation is not enough to establish that the error was harmless."). As discussed, the State had to prove the elements of premeditation, deliberation, and willfulness beyond a reasonable doubt, and the

evidence was not so great that it precluded a verdict of second-degree murder based on a finding that Mortensen's actions were not the result of deliberation under *Byford*. *See, e.g.*, *Riley*, 786 F.3d at 725; *Polk*, 503 F.3d at 911–13.

Having determined the NSC unreasonably applied *Chapman* to the evidence at trial, the Court applies *de novo* review to the determination whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." The jury, by virtue of the erroneous *Kazalyn* instruction and the State's arguments was never properly instructed on the requirements for deliberation as an element of first-degree murder. And as discussed, a rational juror, properly instructed, could have drawn reasonable inferences from the evidence that Mortensen's actions constituted a mere "unconsidered and rash impulse," which falls outside the requirements of first-degree murder. *See supra* at pp. 20–23.

Because the State was required to prove each element of the charge beyond a reasonable doubt, the failure to give the *Byford* instruction to the jury had a substantial and injurious effect on the determination of the verdict and rendered the trial fundamentally unfair. In the presence of grave doubt whether the error had such an effect, Mortensen is entitled to the writ. *See Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000). For the foregoing reasons, Mortensen is entitled to federal habeas relief on Ground I.

## B.    Ground II—Suppression of Evidence

Mortensen alleges the State suppressed three forms of evidence in violation of Due Process: (1) that Brady told fellow Metro Officer Mark Barry he wanted to conduct a drive-by shooting; (2) Brady was investigated for sexually assaulting Carye Morris during her arrest and would have testified she heard Brady call himself "evil"; and (3) witness Ruben Ramirez's criminal history. ECF No. 176 at 45–91. Mortensen argues that, in determining the evidence immaterial, the NSC analyzed the evidence in isolation rather than collectively and applied an improper materiality standard. *Id.* Respondents argue there is no *Brady*[9] violation and the NSC's determination is neither contrary to nor involves an unreasonable application of clearly established Supreme Court

---

[9] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

authority. ECF No. 218 at 44–61.

### 1.    The State's Obligations Under *Brady*

The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecutor. *See Brady*, 373 U.S. at 87. The prosecution is required to produce material exculpatory and impeachment evidence to the defense whether the defense requests such evidence. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97 (1976)). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (quoting *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)).

A *Brady* violation for failure to disclose evidence contains three components: (1) evidence is favorable because it is exculpatory or impeaching, (2) the State suppressed that evidence, and (3) the evidence was material or resulted in prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 281–82). "*Brady/Giglio* claims are evaluated collectively, but we 'must first evaluate the tendency and force of each item of suppressed evidence and then evaluate its cumulative effect at the end of the discussion.'" *United States v. Kohring*, 637 F.3d 895, 903 (9th Cir. 2011); *Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).

"Favorable evidence includes both exculpatory and impeachment material that is relevant either to guilt or punishment." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *United States v. Bagley*, 473 U.S. 667, 674–76 (1985) and *Giglio*, 405 U.S. at 154). "Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Id.* (citing *Strickler*, 527 U.S. at 290). "Evidence favorable to an accused" includes evidence that would help the defendant impeach a witness. *See Giglio*, 405 U.S. at 154–55.

"Because prosecutors are in a 'unique position to obtain information known to other agents of the government,' they have an obligation to 'disclos[e] what [they] do [ ] not know but could have learned.'" *United States v. Cano*, 934 F.3d 1002, 1022 (9th Cir. 2019) (brackets in original)

(quoting *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997)). *See also Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). "[W]hether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S. at 87), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 437–38 (internal citation omitted).

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280, 289. One shows a *Brady* violation by showing "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Materiality is "not a sufficiency of evidence test," e.g., "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–35. Likewise, the question "[i]s not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289–90.

On the other hand, "'[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.'" *Agurs*, 427 U.S. at 109–10). *See also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (acknowledging that granting a writ of habeas corpus "on the basis of little more than speculation with slight support" is improper). Moreover, evidence impeaching a witness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (finding that was not the case when a witness's testimony was the only evidence linking the defendant to the crime).

The question of the materiality or prejudice of withheld evidence "must be analyzed 'in the context of the entire record.'" *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) (citing *Agurs*,

427 U.S. at 112). To determine prejudice, a court must "undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Bailey v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003) (quoting *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001) (stating such an approach is required by *Kyles*, 514 U.S. at 441–54)).

### 2. Ground II(A)—Testimony about Brady's Drive-By Remarks[10]

#### a. Additional Background

At trial on May 5, 1997, Brady denied talking with Officer Mark Barry, about "harassing" the public:

[BY DEFENSE COUNSEL]:

Q.    And I take it you had done this kind of thing before, hadn't you?

A.    No, sir.

Q.    You mean to tell me this very first episode occurred on December 27, 1996?

A.    Yes, sir.

Q.    Brand new idea that just popped into your head when you got to Twain and Maryland Parkway?

A.    Yes, sir.

Q.    Just you—it just dawned on you, you know, there would be a lot of fun; I think I am going to drive down Twain recklessly and turn hard right on Cambridge? And start harassing people?

A.    Yes, sir.

Q.    Now, the genius for this idea was yours?

A.    Yes, sir.

Q.    You hadn't discussed doing this kind of thing with other officers, had you?

A.    Not the harassing part.

Q.    Well, let me ask you if you know the name of Officer Mark B[a]rry.

A.    Yes, sir, I do.

Q.    Who is he?

A.    Mark B[a]rry and I were partners on a bike patrol squad.

. . . .

Q.    Ever talk to him about this kind of thing?

A.    No, sir.

---

[10] The Court subdivides the claims in Grounds II and III for clarity.

ECF No. 30-1 at 31–32.

On May 8, 1997, defense counsel stated at trial that he previously mentioned he received an anonymous call informing him that Brady told Officer Barry he wanted to conduct a drive-by shooting, and the prosecutor stated they "had an investigator talk" to Barry and Barry denied it:

> [Defense Counsel]: [W]hile we are here on the record, I mentioned the other day that I got even another anonymous phone call from someone at my office who indicated that Christopher Brady had, several weeks prior to the shooting in question, been at a bar and told an officer by the name of Mark B[a]rry that he wanted, he, Brady, wanted to do a drive-by shooting.
>
> I gave this information—
>
> [The State]: We have talked to Mark B[a]rry. I had an investigator talk to Mark B[a]rry. He said it is nonsense but I wanted to make that part of the record.

ECF No. 33 at 14.

On July 28, 1998, Officer Barry testified to a federal grand jury that Brady had repeatedly expressed a desire to conduct a "drive-by," and although Barry thought Brady was joking, Barry said that when "all of the sudden it happened," "you have got to put two and two together":

> Q.  Did there come a time at PT's when you heard Chris talking about doing any kind of vigilante action?
>
> A.  Yeah. He had mentioned several times the fact about going and doing a drive-by or something like that nature to myself. I know that. But I never really took him serious because, like I said, we were all drinking, and it was something that was brought up. He didn't really stay on that, but he would mention it, you know. And we would kind of giggle at him like, yeah, hey, you know, let's go do a drive-by and kind of let it rest at that as well as he did.
>
> And like I said, no one really thought that he was being serious about it because, you know—maybe it was the fact that we were drinking as well that we didn't take it serious. But, you know, when he told me that, I know it was kind of a joke to me and in jest about it. It wasn't something serious.
>
> Q.  Now, when he would say things like that, would it be in response to anything that had happened at work, or general displeasure with criminal elements, or what would he be expressing?
>
> A.  I can't remember exactly what we talked about, but I—it seemed to me that he would just all of a sudden out of the blue bring it up. It's possible that, yeah, we were talking about the criminal element, but I don't—I can't remember. I mean, I just remember him bringing it up. And it was more like, yeah, okay, let's go do it. Right.
>
> . . . .
>
> Q.  Now, did you ever hear Chris Brady talk about doing a drive-by in the months after you were no longer on the bike squad with him?
>
> A.  No, I never—me and Chris Brady were never really tight.
>
> . . . .

Q.    When you heard about the incident in McKeller Circle in that December, did this trigger your memory about these comments of doing the drive-by?

A.    Yes, it did.

Q.    What did you think when you heard about that?

A.    At first I didn't believe it. No way. I don't know Ron Mortensen. I have never met him, never seen him before. And I just start thinking, wow, maybe he was serious. But, you know, like I said, maybe it's because I was drinking, but I thought I was a pretty good judge of character. And at the time I thought he was joking. But mentioned it several times, and all of a sudden it happened. You have got to put two and two together.

. . . .

Q.    How many times would you say you heard [Brady] talk about drive-bys"

A.    I can't put a—I know it was mentioned a few times.

Q.    [W]hen we spoke yesterday, I think you said at least a half a dozen. Would that be accurate?

A.    Safe to say a half a dozen.

. . . .

A.    But like I said as far as him saying that, I remember it because I was there. And I remember him being there because he said it, but I can't recall who else was there. I mean it was like, you know, like I said, no one really took it serious. I didn't take it seriously. It was just a comment that he said a few times and no big deal.

Q.    And it wasn't until later that you were able to put something together?

A.    Right . . . You going to go do a drive-by to me is saying I am going to commit a homicide. Friend or not, I am going to act. If I thought he was serious or anyone being serious, I would have jumped in . . ..

ECF No. 36 at 27–31, 39, 40.

Barry further testified to the federal grand jury that two individuals telephoned him about the Mortensen case, but neither was a Metro homicide detective, and he refused to talk with them over the telephone about a murder:

Q.    Did you testify at the murder trial they had for—

A.    No, I did not.

Q.    Did anybody subpoena you to testify?

A.    Nobody subpoenaed me . . . I had two people call me on different occasions and basically talk to me about the trial and say they were some attorney. But I didn't—the name they mentioned, I didn't know who it was. I wasn't familiar with them. And I'm not going to talk to anybody over the phone, especially involving a murder.

I heard I was going to be subpoenaed and I told everybody, yeah, you know, subpoena me. You know, I need to say some things. And I thought I was going to be subpoenaed, but nothing ever came forward.

Q.    Did the homicide detectives ever come talk to you?

30

A.      No, homicide never came talked to me.

ECF No. 36-1 at 3–4.

On August 7, 1998, Mortensen's counsel learned about Barry's federal grand jury testimony and promptly filed a motion for new trial based on this newly discovered evidence. ECF No. 36 at 14–15. On October 9, 1998, the state district court held an evidentiary hearing on the motion for new trial where Barry testified he initially believed Brady's remarks were made in jest to blow off steam, the remarks were made when Brady worked with Barry on the bicycle squad, and that Brady left the bicycle squad six to eight months before the shooting:

> [BY DEFENSE COUNSEL]:
>
> Q.      What context would this subject come up?
>
> A.      It was mainly like you said earlier, we were out drinking, having a good time, blowing off steam, talking about the shift. And he would just make the comments basically in a joking text. He would bring it up, he would say something to the sort. He would never say "hey, will you come do a drive-by with me["] or nothing direct like that. It would also be something to the fact where "hey, let's do a drive-by" and, you know, I would giggle a[nd] laugh a little bit and take it in sheer gist [sic] and, you know, he would giggle and laugh and it would be done and over with.
>
> Q.      Well, when you would have these conversations did he ever indicate what area of town he would like to do this in?
>
> A.      No.
>
> Q.      Did he ever talk to you on these occasions about certain areas of town?
>
> A.      No.
>
> . . . .
>
> Q.      Now, can you recall when it was you last had one of these conversations with Chris Brady wherein he talked about doing one of these drive-by shootings in relation to December 28, 1996?
>
> A.      Prior to that date that the homicide took place, there is a period of time that he was on the bike team only for eight months to a year, maybe, that I had had the occasion to work with him riding as a partner. And it was within that time frame that we worked together. I believe it was '95, closer to the end of '96, maybe.
>
> . . . .
>
> Q.      Now, were you aware of the kind of vehicle Chris Brady was driving in December of 1996?
>
> A.      I didn't know at the time. Like I said, he had left the bike squad maybe six months to eight months prior to this taking place . . ..

ECF Nos. 36-3 at 5; 36-4 at 11–19.

At the evidentiary hearing, Barry confirmed that, shortly after the shooting, he told fellow

Officer Sheehan about Brady's remarks; but when two strangers telephoned him, he denied Brady told him he was going to do a drive-by shooting, and declined to tell them what was actually said because the calls concerned a homicide trial and Barry would not provide details on the telephone to people whom he did not know and could not identify:

> [BY DEFENSE COUNSEL]:
>
> Q.    Now did you ever tell anyone after the shooting of Daniel Mendoza about your conversations?
>
> A.    I believe I did, yes.
>
> Q.    Who did you talk to?
>
> A.    I think it was Officer Sheehan, John Sheehan.
>
> . . . .
>
> Q.    When did you talk to John Sheehan?
>
> A.    I don't know the exact date. It was during the swat test. I want to say probably '96. It was shortly after the incident, the homicide took place, and the trial was ongoing.
>
> Q.    Did you ever call my office to volunteer this information without telling me who you were?
>
> A.    No, I didn't.
>
> Q.    During the trial did a Don Dibble contact you and ask you had you ever been with Chris Brady when he talked about doing a drive-by shooting?
>
> A.    I don't know—I was contacted by two separate individuals, a female. To the best of my knowledge she said that she was working for a law firm who she used to be employed with—she named a few different law firms. I didn't know who she was.
>
>        She would ask me situational questions like "I heard Chris Brady told you to do a drive-by," and I said "no, that's completely not true."
>
>        And I was also contacted by a male. I don't know—it's possible it was Don Dibble, someone that I had no knowledge who it was. And both of these were phone contacts.
>
>        And they were asking me similar type questions about me and Chris Brady.
>
>        And the question I believe that he asked me was basically the same thing that "did Chris Brady tell you he was going to do a drive-by"? [sic] And I said "no."
>
> Q.    You didn't think the conversations you had with Chris Brady were close enough to what you were being asked?
>
> A.    Yeah, it was definitely close enough, but at the time, like I said, I am on the telephone. I am not—I don't know who I am talking to. It's during a homicide trial. I am not going to get into it on the telephone and explain to him, you know, this was actually what was said. Both individuals told me they were going to subpoena me.
>
> Q.    Was there a reason you told Officer Sheehan?
>
> A.    Yeah, He had—he had—it just came after the point where part of the swat

tested shooting and I ended up throwing a round and John had approached me and said "hey, what's going on? I know you are not like this. What's on your mind?"

And I told him—I said, "look, I just heard that, you know, I got to go testify right after this test and I just got a lot on my mind." And I said "it's [in] reference [to] some things that Brady had said to me."

Q.    Now, you thought that was significant what Brady told you at that time, did you not, the time you spoke with Sheehan?

A.    At that time, yeah, I did.

Q.    Is there a reason you didn't report what you knew to homicide?

A.    Yes, because like I said, I was told I was going to be subpoenaed by both of these individuals.

Q.    You were also contacted by a representative of the District Attorney's Office during that trial?

A.    Like I said, I was contacted by two people, a female and a male. I couldn't tell you the names. It was over two years ago.

ECF No. 36-4 at 11–18.

The state district court denied the motion for new trial finding Brady's statements to Barry, made eight to 12 months before Mendoza's death, did not suggest Brady fired the shots, and a different result was improbable considering the totality of the trial testimony. ECF No. 36-2 at 16.

### b.    State Court's Determinations

On appeal from the denial of the postconviction petition, the NSC determined the State did not violate *Brady* because Barry's testimony was immaterial:

Mortensen claims that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence uncovered in a concurrent federal grand jury proceeding that would have been useful to impeach State witnesses Christopher Brady and Ruben Ramirez. This court has already concluded that the evidence at issue would not have affected the outcome of trial. *See Mortensen*, 115 Nev. at 286–289, 986 P.2d at 1113–1115; *Mortensen*, Docket No. 35316 (Order of Affirmance, October 5, 2001), at 3–5. Because the evidence was not material, Mortensen's *Brady* claim fails. *See Browning v. State*, 120 Nev. 347, 369, 91 P.3d 39, 54 (2004).

ECF No. 176-2 at 5. The NSC incorporated the following decision in pages 286–289 of its earlier affirmance on direct appeal of the denial of the motion for new trial:[11]

[M]ortensen argues that the district court wrongfully denied his motion for a new trial based on newly discovered evidence.

---

[11] *See, e.g., Barker*, 423 F.3d at 1093 (stating that "[T]he last reasoned decision adopted or substantially incorporated the reasoning from a previous decision and, as a result, it was reasonable for the reviewing court to look at both decisions to fully ascertain the reasoning of the last decision.").

. . . .

To establish a claim for a new trial based on newly discovered evidence, the defendant must show that the evidence is

> newly discovered; material to the defense; such that even with the exercise of reasonable diligence it could not have been discovered and produced for trial; non-cumulative; such as to render a different result probable upon retrial; not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable; and the best evidence the case admits.

*Sanborn v. State,* 107 Nev. 399, 406, 812 P.2d 1279, 1284–85 (1991) (footnote omitted). The grant or denial of a new trial based on newly discovered evidence is within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *Id.* at 406, 812 P.2d at 1284.

. . . .

[M]ortensen argues that a new trial is warranted based on the testimony of LVMPD Officer Mar[k] Barry before a federal jury on July 28, 1998, well after Mortensen's conviction. Barry testified that Brady "had mentioned several times the fact about going and doing a drive-by or something like that nature." Barry testified that Brady made this statement approximately six different times. The statements were made approximately one year prior to Mendoza's death.

We conclude that this evidence was not discoverable with reasonable diligence. Defense counsel received an anonymous phone call during the trial, which roughly suggested the contents of Brady's statements to Barry. However, Barry denied knowledge of any such statements when contacted by an investigator retained by the defense. Barry also denied knowledge of the statements when contacted by the district attorney. Thus, Mortensen exercised due diligence but was unable to confirm whether Barry had knowledge of any such statements made by Brady.

We conclude that Barry's testimony regarding Brady's statements would not be such as to render a different result on guilt or innocence probable upon retrial. The only dispute over the identity of the person who fired the fatal shot was between Brady and Mortensen.

All of the eyewitnesses testified that the passenger was the actual shooter. It is undisputed that Mortensen was the passenger. Witnesses also provided physical descriptions of the shooter, which were consistent with Mortensen's appearance. It is also undisputed that the murder weapon was Mortensen's off-duty Sig Sauer. Numerous shell casings from Mortensen's gun were found in the street suggesting that the fatal shots were fired with the weapon having been pointed and discharged from a position outside of Brady's truck as described by the eyewitnesses. Additionally, no evidence was ever developed that Mortensen pointed another weapon out of the truck window while Brady fired the fatal shots.

> [FN 15] Brady claimed that he also drew and pointed his off-duty revolver during this incident. Mortensen never claimed that he was holding Brady's revolver. Again, however, the jury was provided with all of this information.

Certainly, the jury heard Brady concede that it was his idea to commence a pattern of citizen harassment that night. The jury heard Brady concede that he made the choices of where to drive to conduct this harassment until Mortensen suggested they turn into McKellar Circle. The same jury also heard Brady's admission that he advised Mortensen to keep quiet and that he destroyed or modified what might have been important evidence. Further, Brady's admissions exposed him to the possible

commencement of separate state and/or federal proceedings against him and, thus, were against his penal interests. His participation in this drive-by shooting was in part consistent with Barry's grand jury testimony that Brady had contemplated involvement in this type of activity. Almost all of this, including the alleged effect of Brady's connections within the police department, his modification of the truck and other physical evidence, and the claim that witnesses could have been confused as to the identity of the shooter, was comprehensively argued to the jury. Brady denied ever discussing the prospect of engaging in "drive by" activities with Barry. His possible perjury on this point would demonstrate his attempt to minimize any inference of a greater degree of involvement. However, Barry's proposed testimony does not exonerate Mortensen. In sum, the evidence demonstrates that two rogue police officers were engaged in unlawful activities that led to the tragic death of Daniel Mendoza. Both were clearly subject to criminal prosecution. At Mortensen's trial the jury was the final arbiter of the truth, based upon all of the evidence submitted, Barry's proposed testimony is insufficient to satisfy the requirements for a new trial.

*Mortensen v. State*, 115 Nev. 273, 286–89, 986 P.2d 1105, 1113–16 (1999).

### c.     Analysis of Undisclosed Evidence of Drive-By Remarks

### i.     Materiality

As stated, the three components of a *Brady* violation are: (1) evidence is favorable because it is exculpatory or impeaching, (2) the State suppressed that evidence, and (3) the evidence was material or resulted in prejudice. *See Strickler*, 527 U.S. at 281–82. Here, the NSC appears to have expressly adjudicated the materiality component and determined that defense counsel could not, through the exercise of due diligence, have uncovered Barry's testimony. *See supra* at pp. 33–35. As the NSC did not adjudicate whether the evidence was favorable and whether the State suppressed the evidence, review of those requirements under *Brady* and its progeny is *de novo*. *See Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015) (holding where the state court made "no factual finding or holding as to the nondisclosure element" the Court reviewed the record *de novo*) (citing *Wiggins v. Smith*, 539 U.S. 510, 530 (2003)).

The NSC summarized the evidence at trial that supports the verdict and the evidence that undermined Brady's credibility and motivations, and determined there is no reasonable probability the outcome of the trial would have been different because "Barry's proposed testimony does not exonerate Mortensen." *See supra* at p. 35. The Supreme Court, however, has explained that the materiality component is not an insufficiency of evidence test nor does it require "[d]emonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an

35

explanation for the crime that does not inculpate the defendant). *See Kyles*, 514 U.S. at 434. Because the NSC unreasonably applied clearly established federal law as determined by the Supreme Court, this Court's review of *Brady* materiality is *de novo*.

Here, the prosecutor stated in closing remarks, there were only two questions to be answered in the trial (1) whether the killing was first-degree murder, second-degree murder, or manslaughter; and (2) "who is the individual who fired that weapon." ECF No. 34 at 8–9.

All fairminded jurist would agree that Barry's testimony would have exposed Brady's lie about whether he discussed harassment of civilians—and a drive-by shooting most certainly qualifies as harassment—and therefore could have affected Brady's credibility. There was no evidence establishing a motive for the shooting, and the State argued this was a "thrill kill" or "recreational killing." That description of the motive fits the concept of a drive-by shooting. Even Officer Barry surmised that his testimony about Brady's expressed desire to conduct a drive-by shooting was significant to a determination who shot Mendoza. Thus, it is reasonably probable Barry's testimony would have changed the complexion of the case by undermining Brady's credibility while exposing he might have a motive for the shooting that Mortensen did not. This, in turn, could have affected the believability of Mortensen's version of the events and his claim that Brady took the Sig Sauer and fired the shots.

Barry's testimony could also have placed the eyewitness testimony in an entirely different light and made it appear to the jury more probable the eyewitnesses were mistaken about their identification of Mortensen as the shooter. Brady testified he stuffed his firearm across Mortensen's chest and pointed his gun out the passenger window, but none of the eyewitnesses saw him do that; indeed, none of the eyewitnesses saw Brady's activities. *See supra* at pp. 2, 8–11. Unaware of Brady's forthcoming testimony, some of the eyewitnesses were convinced it was impossible for the driver to lean across the truck seat and fire the shots; however, Brady and even the State conceded it was possible for him to have done so. *See supra* at pp. 2–3, 8–11; ECF No. 34-2 at 20–21 ("And I am not here to tell you that you cannot do it the way Ron Mortensen says Christopher Brady did it. I mean, it can be physically done, I suppose, to straddle yourself across the seat and do it without the shell casings landing in the bed of the truck or in the cab, it can

physically probably be done."). A rational juror could construe the eyewitnesses' failure to see Brady's activities and the erroneous supposition that it was impossible for Brady to have fired the shots as having caused the eyewitnesses to testify they believed they saw the passenger, which was indisputably Mortensen, holding and shoot the gun, and account for inconsistencies in that testimony: Rodriguez said Mortensen held the gun in his left hand (Mortensen is right-handed and a gun to his left would be consistent with Brady having fired the shots); Ramirez testified he saw Mortensen holding the gun in one of his hands, but the record fails to confirm whether Ramirez said it was in the left or right hand; Martinez said he saw Mortensen holding the gun in both hands; Zurita said she saw Mortensen holding the gun in both hands in front of his forehead with his arms resting on the door; and Lujan testified she did not see the driver's hands on the steering wheel but saw a gun come out the passenger side of the truck. *See supra* at pp. 8–11. Had the jury known Brady earlier contemplated conducting a drive-by shooting, the eyewitness testimony corroborating Brady's testimony that the passenger, i.e., Mortensen, was the shooter, could reasonably be calculated to lose impact.

Barry's testimony could also have placed the ballistic evidence in an entirely different light. Mortensen's firearm indisputably fired the fatal bullet and one of Mortensen's fingerprints was found on the firearm. But Mortensen testified he placed his firearm under his left hip "on the seat" where Brady had access to it and that Brady used it to fire the shots. It was undisputed that Brady handled the firearm for two days before turning it over to the police and, yet his fingerprints were not on the firearm. Shells found at the scene suggested Mortensen's firearm was pointed and discharged from a position outside of the truck; however, the expert testified the Sig Sauer ejected cartridges to the right and slightly forward and the State conceded in rebuttal that it was possible for the shell casings to land outside the truck if the shooter was the driver. *See supra* at p. 37.

Given the concessions that Brady could have fired the shots, the relative weight and credibility of the other trial evidence, and the lack of evidence that Mortensen expressed a desire to conduct a drive-by shooting, the only reasonable conclusion to be made is that it is reasonably probable that Barry's testimony conveying Brady's expressed desire to conduct a drive-by shooting could have affected the jury's determination of the weight and credibility of the other

evidence in the case on the issue whether the State proved beyond a reasonable doubt that Mortensen, not Brady, fired the shots, as Barry's testimony would have exposed that Brady had a motive that Mortensen did not. *See, e.g.*, *Giglio*, 405 U.S. at 154–55 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.").

Barry's testimony would have placed evidence concerning Brady's motivations and credibility in such a different light as to undermine confidence in the verdict. Brady was Mortensen's superior officer and Mortensen was on employment probation. In addition to the concessions that Brady could have fired the shots, Brady conceded it was his idea to commence a pattern of citizen harassment and he chose where to drive to conduct that harassment. Brady admitted he advised Mortensen to keep quiet. He admitted he destroyed or modified what might have been important evidence, including the truck, the firearm, and his clothing. The jury was presented with a theory that Brady's connections within the police department, through his father, shielded him from scrutiny and charges. Evidence of Brady's prior remarks to a fellow officer about a desire to conduct a drive-by shooting would place all of that evidence in an entirely different light that, under the circumstances, undermines confidence in the verdict. *See Kyles*, 514 U.S. at 435 ("The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (quoting *Bagley*, 473 U.S. at 678).

Accordingly, Barry's testimony about Brady's drive-by shooting remarks was material.

### ii.    Favorability

Barry's testimony was favorable. As explained, evidence of Brady's desire to conduct a drive-by shooting would have assisted the defense in impeaching Brady's credibility, exposed Brady's motivations for shooting the firearm, and placed the circumstances of Brady's cooperation and the destruction of evidence in an entirely new light and would have been favorable to the defense theory that Brady was the gunman.

### iii.    Suppression

The NSC's determination that the defense could not obtain Barry's information through

the exercise of reasonable diligence is objectively reasonable. *See supra* at p. 34.

The Ninth Circuit has held that, for purposes of a due process claim under *Brady*, there is no suppression where the defense "has enough information to be able to ascertain the supposed *Brady* material on his own." *See Milke*, 711 F.3d at 1017–18 (citing *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). *See also United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) (holding no *Brady* violation where there was no indication defense counsel "was aware of facts that would have required him to discover" an affidavit filed in the public records through his own diligent investigation). On the other hand, "[w]here a defendant doesn't have enough information to find the *Brady* material with reasonable diligence, the state's failure to produce the evidence *is* considered suppression." *Id.* (emphasis in original).

Defense counsel's investigator contacted Barry by telephone, but Barry was not forthcoming about his information. The State, who had obligations under *Brady*, represented to the defense that it had investigated and learned the claim was false. Under the circumstances, it was not unreasonable for the NSC to conclude the defense could not discern through the exercise of reasonable diligence Barry's testimony about Brady's drive-by remarks.

The State's ability to obtain the information is a wholly different matter. As stated, the Court reviews the suppression by the State *de novo* as the NSC did not adjudicate that component of the *Brady* claim. Prosecutors are in a unique position to obtain information known to other agents of the government and have an obligation to disclose what they do not know but could have learned. *See Cano*, 934 F.3d at 1022 (quoting *Carriger*, 132 F.3d at 480). This Court is persuaded that, depending on the facts and circumstances, a prosecutor may be required to exercise due diligence in gathering evidence that it must disclose to the defense. *See, e.g.*, *United States v. Cerna*, 633 F. Supp. 2d 1053, 1061 (N.D. Cal. 2009) (A "prosecutor is required to use due diligence—affirmative due diligence—to gather *Brady* material from known and plausible sources of exculpatory information and then to turn over any *Brady* material that is found. The degree of diligence that is due depends on the facts and circumstances"); *Riddle v. State*, 96 Nev. 589, 590, 613 P.2d 1031, 1032 (1980) (explaining that a "[t]rial court is vested with the authority to order the discovery and inspection of materials in the possession of the state," and that "discretion,

however, is predicated on a showing that the evidence sought is material to the preparation of the defense and the existence of the evidence is known or, by the exercise of due diligence, may become known to the district attorney"). *See also Kyles*, 514 U.S. at 438 ("[p]rocedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.") (quoting *Giglio*, 405 U.S. at 154).

It appears the defense informed the State at trial of the prospect that Officer Barry had material information favorable to the defense, i.e., that Brady may have expressed to Officer Barry a desire to conduct a drive-by shooting. Once aware, the State had a duty under *Brady* and its progeny and based on the highly unusual circumstances of the case, to exercise due diligence in gathering evidence of Officer Barry's information. This was a highly publicized and emotionally charged murder case[12] involving a reckless off-duty shooting by a Metro officer into a group of innocent bystanders that resulted in death. Although other Officer-witnesses were interviewed by homicide detectives, no one from homicide contacted Officer Barry. The District Attorney's Officer instructed Detective Becker to interview Brady's father. ECF No. 28-2 at 35–36. Officer Bongiovani testified "George Young, homicide" interviewed him. ECF No. 36–37. Officer Mohr was interviewed by Detective Bigham. ECF No. 33-1 at 9.

Under these circumstances, the State knew that the nature of Barry's information, if confirmed, could have consequences for the trial and would be potentially favorable to the defense. Yet, as with the investigation of information from other Metro officers, the State did not direct that a homicide detective contact Officer Barry. As the State failed to provide a clearly identifiable

---

[12] The record shows the media had access to all hearings in the case. ECF Nos. 19 at 7–9; 10–11; 20 at 5–6. Defense counsel testified that during the trial, there was fear of riots if the jury acquitted Mortensen:

> And then during the trial, before the verdict was reached, they claimed they were fearful of riots should there be an acquittal. So they—
>
> And that was the subject of a newspaper story.
>
> So I believe the jury was segregated, extra security, there was, I think, a newspaper story about how the police department was prepared for a riot. I believe the verdict was delayed a day for these police procedures.

ECF No. 176-3 at 174.

investigator or obtain an interview through appropriate channels and chain of command, it did not uncover Barry's information due to its failure to exercise due diligence under the circumstances of the case. In short, the State failed to disclose what it could have obtained.

Accordingly, applying *de novo* review, the State suppressed Barry's information for purposes of its disclosure requirements under *Brady. See Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases [involving *Brady* violation] is the fairness of the trial, not the culpability of the prosecutor."). Mortensen is entitled to federal habeas relief for the allegations in Ground II(A).

### 3.    Ground II(B)—Morris's Allegations

Mortensen did not present a *Brady* claim that the State failed to disclose Carye Morris's sexual assault allegations or her testimony that Brady told her he is an evil man, in either his direct appeal or postconviction petition. ECF Nos. 40 at 1–7; 41; 41-1; 41-2; 41-3; 44-2 at 36–38; 44-3 at 1–4; 44-6; 50-1 at 4–8. Accordingly, the NSC did not address such a claim. ECF Nos. 38-1 at 16–17; 44-6 at 4.

A state prisoner first must exhaust state court remedies on a habeas corpus claim before presenting that claim to the federal courts. 28 U.S.C. § 2254(b)(1)(A). This exhaustion requirement ensures that the state courts, as a matter of comity, will have the first opportunity to address and correct alleged violations of federal constitutional guarantees. *See Coleman*, 501 U.S. at 730–31. "A petitioner has exhausted his federal claims when he has fully and fairly presented them to the state courts." *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014). To satisfy the exhaustion requirement, a claim must be raised through one complete round of either direct appeal or collateral proceedings to the highest state court level of review available. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999); *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003). Fair presentation requires presentation to the state courts of the operative facts and federal legal theory upon which the claim is based. *See Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005).

Respondents previously moved to dismiss this claim as unexhausted. ECF No. 185 at 9. The Court denied that motion because, in the NSC's decision on Mortensen's appeal of the denial of the first motion for new trial, the NSC discussed Morris's "alleg[ation] that Brady coerced her

into performing an illicit sexual act upon him during transport to the Clark County Detention Center" in affirming the denial of a new trial based on newly discovered evidence. ECF No. 212 at 8–9 (citing 38-1 at 16).

Further review of the state-court record reveals that Mortensen raised no *Brady* claim, and therefore neither fairly presented nor exhausted such claim, in the state court proceedings related to Morris's assault allegations or testimony that Brady called himself "evil." Ground II(B) is technically exhausted by procedural default. Because "the interests of comity and federalism will be better served by addressing the merits forthwith" rather than "by requiring a series of additional state and district court proceedings before reviewing the merits," the Court reviews the claim *de novo. See Granberry v. Greer*, 481 U.S. 129, 134 (1987).

### a.    Additional Background

On October 17, 1996, Carye Morris was arrested for outstanding traffic warrants and Brady transported her to jail. ECF No. 22-3 at 31. After Mortensen's arrest was publicized, Morris reported to the Metro Internal Affairs Bureau ("IAB") that Brady sexually assaulted her during transport to the jail. *Id.* Due to a lack of credible evidence, it was determined there was no basis to submit the matter to the District Attorney's Office for consideration for criminal prosecution. *Id.*

At trial, on May 7, 1997, Mortensen testified Brady fired the shots using Mortensen's weapon, and Brady described himself as 'evil' when he told Mortensen why he fired the shots. ECF No. 32-1 at 15–16. The next day, Morris contacted the news media about her story and the State revealed Morris's complaint against Brady to the defense at trial:

> [THE STATE]: Here is the incident. Some time ago, in fact, quite a long time ago, Brady and Mortensen were working on the same shift and Mortensen responded to a call of a woman who I will leave nameless right now, and the woman was going to be cited, taken down to the jail.
>
> As a result, Mortensen calls Brady. He says, "Brady, you know, I got one here for you," or something of that nature.
>
> And Brady then comes over and picks up the woman to transport her. The woman had previously been begging Mortensen, "Listen, I will do anything if I don't have to go to jail."
>
> That's when Brady is called.
>
> The allegation then is that Brady says, "I will take her in for you, Ron." And Brady then proceeded to take her down toward the station.

> However, while taking her down to the station, she alleges that Brady deviates and he takes her up on her offer to do anything, which was of a sexual nature, and receives a sexual gratification through a blow-job or fellatio.
>
> Nonetheless, Brady books her in the jail. Our records indicate that he booked this woman in the jail.

ECF No. 33 at 8–14. The State reported IAB found the accusation incredible, and Morris failed multiple polygraph examinations. *Id.* Defense counsel stated he received similar information from an anonymous source:

> [DEFENSE COUNSEL]: I am glad you brought it to the Court's attention.
>
> I got a phone call in yesterday from another anonymous source. This was a woman who told me that she had a girlfriend who said that she had been sexually abused by Brady. I don't know if it is the same woman or not.
>
> She mentioned a name it was a Car[ye] something or other.
>
> [THE STATE]: That's it. It's Car[ye].
>
> [DEFENSE COUNSEL]: Before I left this morning I had a telephone call. I didn't return it, from a Car[ye].
>
> [THE STATE]: That is the name of the woman. The name of the woman I believe is Car[ye] Moore. Actually, what I believe the name is, she has a girlfriend has allegedly known about this but the girlfriend has also refused to go to Metro or refused to talk to anyone.
>
> THE COURT: How do you know Car[ye] is calling the press?
>
> [THE STATE]: Because it was brought to our attention that—because quite frankly Car[ye] called Thomas Moreo and, hey, I am really upset because you guys never contacted me and I am calling the press.
>
> . . . .
>
> THE COURT: I think if this information comes out and the jury reads it, somebody is not going to look good for either side.
>
> [THE STATE]: Right, Judge. Good for either side.
>
> [DEFENSE COUNSEL]: Well, from the recitation, he didn't do anything.
>
> THE COURT: He didn't do anything as I see it.
>
> [THE STATE]: I think what she is alleging is that both these guys are crooked because they are both in on this when she is offering the favors to Mortensen.

*Id.* Later that day, Mortensen's counsel confirmed he spoke with Morris. ECF No. 33-1 at 26. The defense did not call Morris as a witness.

After trial, Morris told defense counsel that she had told her therapist she asked Brady why he abused her and he told her, "Because I am an evil man." ECF No. 22-2 at 21. Mortensen filed a second motion for new trial claiming this was new evidence corroborating Mortensen's testimony that Brady stated he shot the firearm because he is "evil" and undermines Brady's

credibility such that it is reasonably probable to have changed the outcome of trial. *Id.* at 22–23. The defense did not assert a *Brady* claim; rather the defense argued a new trial was warranted based on the new evidence and, although the State was aware of Morris's complaint before trial, it never revealed Morris's existence until midway through trial when it provided inaccurate information and did not disclose she claimed Brady described himself as "evil." *Id.* at 22.

The State opposed the motion arguing, among other things, defense counsel was made aware at trial of Morris's complaint against Brady, Morris's statements were available through the exercise of due diligence, Brady's description of himself as "evil" did not bear on whether Brady or Mortensen shot Mendoza, and the alleged sexual assault could not be proven by clear and convincing evidence. ECF No. 22-3 at 10, 16–25. The State attached an affidavit of District Attorney Stewart L. Bell, who declared that nowhere in a three-inch-thick stack of investigative materials concerning Morris's sexual assault allegations did Morris previously attribute to Brady the phrase "I am evil." *Id.* at 30. Bell further stated that during his hour-long conversation with Morris, she did not relate that Brady said the reason for the alleged sexual assault was that "he was evil" and that Chief Deputy District Attorney Bill Koot relayed that defense counsel had acknowledged he talked with Morris. *Id.* at 29–30. The State also attached a June 13, 1997, Decision of the District Attorney summarizing the investigation of Morris's complaint, and stating, it was "reasonable to conclude that something untoward and possibly illegal may have occurred between Carye Morris and Christopher Brady on October 17, 1996," but the District Attorney refused to pursue formal charges due to a lack of credible evidence. *Id.* at 31–36.

### b.    Analysis of Ground II(B)

Morris's testimony about the sexual abuse allegations and that Brady called himself "evil" was not suppressed under *Brady*. *See, e.g., In re Coleman*, 344 F. App'x 913, 916 (5th Cir. 2009) ("'Where a defendant fails to establish any one element of *Brady*, we need not inquire into the other components.'") (citation omitted).

"Although disclosure must be made when it is still of substantial value to the accused, the prosecution need not produce *Brady* material before trial." *See United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993) (citing *Aichele*, 941 F.2d at 764). The information about Morris's sexual

assault allegation was disclosed during trial, and defense counsel spoke with Morris during the trial. Thus, the information about Morris's complaint was not suppressed under the circumstances because it was disclosed at a time when it still had substantial value to Mortensen. Mortensen fails to establish the defense lacked the essential facts to enable the defense to take advantage of the evidence by requesting documentation concerning Morris's complaint or was prejudiced by the timing of the disclosure. Defense counsel, through the exercise of reasonable diligence, could have obtained Morris's testimony that Brady called himself "evil."

Accordingly, the State did not suppress information about Morris's complaint or testimony that Brady called himself "evil," and Mortensen fails to establish a *Brady* violation. The allegations in Ground II(B) are dismissed as procedurally defaulted and meritless.

### 4.    Ground II(C)—Witness Ramirez's Criminal History

#### a.    Additional Background

After Mortensen's trial, his counsel filed a third motion for new trial arguing the State failed to disclose Ramirez's criminal history. ECF No. 37-2 at 13–15. Counsel argued the following information was undisclosed:

1. On October 8, 1996, Ramirez was charged by complaint in Las Vegas Township Justice Court with two misdemeanors committed on September 29, 1996: Possession of an Unregistered Firearm and Driving in Violation of Instruction Permit. ECF No. 176-2 at 158–69. He pleaded guilty to the driving charge and the firearm charge was dismissed. *Id.*

2. On February 23, 1997, a complaint for domestic violence was made to Metro, which led to a submission for screening of a misdemeanor Battery (domestic violence) charge against Ramirez and a judge requested an arrest warrant on April 17, 1997. ECF Nos. 37-3 at 29, 36–40; 38 at 1–5; 176-2 at 136.

3. On March 10, 1997, Ramirez sold methamphetamine to an undercover agent working for the State Division of Investigation of Narcotics, which led to a federal criminal complaint on September 9, 1998, charging Ramirez with (1) Distribution of a Controlled Substance, i.e., approximately 2 ounces of a mixture and substance containing a detectable amount of methamphetamine; and (2) Conspiracy to Distribute a Controlled Substance, that is approximately three ounces of a mixture and substance containing a detectable amount of methamphetamine. ECF No. 176-2 at 170–72.

4. On April 18, 1997, Ramirez and two codefendants were charged with Conspiracy to Commit Burglary (gross misdemeanor), and Attempted Robbery (a felony). ECF No. 176 at 145–57. On April 23, 1997, Ramirez entered a guilty plea to the gross misdemeanor charge of Conspiracy to Commit Burglary. *Id.* A Deputy District Attorney declared under the penalty of perjury that the plea was negotiated as such because of difficulties of proof and for no other reason,

and that Ramirez's status as a witness for the prosecution in the Mortensen case was not known by that prosecutor and was not considered and therefore had no bearing on the negotiation of Ramirez's guilty plea. *Id.*

5. On April 25, 1997, Ramirez was cited for Possession of a bludgeoning device, i.e., a 3.5' x 2.5" wood dowel with gang inscriptions on it and ordered to appear in court on May 16, 1997—about 15 days after he finished his testimony in Mortensen's trial. ECF No. 37-3 at 33–35. After Mortensen's trial, Ramirez failed to appear for court and a bench warrant issued for his arrest in July 1997. *Id.* On August 12, 1997, he entered a guilty plea, the charge for bludgeoning device was forfeited, and he was given credit for time served. *Id.*

ECF Nos. 37-2 at 15–16; 37-3.

### b.    State Court's Determinations

On appeal from the denial of the postconviction petition, the NSC determined the State did not violate *Brady* by withholding Ramirez's criminal history finding the evidence immaterial, *see supra* at p. 33, and incorporated pages 3–5 of the Order of Affirmance for Mortensen's appeal from the denial of his third motion for new trial, *Mortensen*, Docket No. 35316 (Order of Affirmance, October 5, 2001):

> For the trial court to properly grant a motion for a new trial, first the evidence must be newly discovered.
>
> [FN 5] *See Sanborn*, at 406, 812 P.2d at 1284–85.
>
> We conclude that only the evidence of the 1997 drug buy was newly discovered. The 1997 drug buy was an undercover investigation that did not result in Ramirez's arrest until after trial. However, the other evidence proposed by Mortensen was not newly discovered because it occurred prior to trial and could have, with the exercise of reasonable diligence, been discovered and produced for trial. Therefore, the remainder of our discussion focuses only on the 1997 undercover drug buy.
>
> Second, the evidence must be material to the defense.
>
> [FN 6] *Id.*
>
> At trial, Mortensen testified that it was Brady who shot Mendoza. Mortensen further testified that he asked Brady why he shot Mendoza and that Brady said, "the son-of-a-bitch had a gun." Mortensen's defense at trial included the assertion that Brady shot the victim because "someone" had a gun. While relevant, this newly-discovered evidence is not direct evidence that someone possessed a gun on the night in question. The evidence is too speculative and tenuous to be material in the context of a motion for a new trial.
>
> Moreover, we conclude that the fourth prong, requiring that the evidence be non-cumulative, is not satisfied. The trial court, in its order denying Mortensen's motion for a new trial, found that the evidence that Ramirez was involved with drugs was cumulative. The jury was fully aware that Ramirez was a member of the 18th Street gang and that the gang was involved in drug-related activities. We conclude that the district court's determination is supported by the trial record and does not constitute an abuse of discretion.

Furthermore, evidence of Ramirez's drug activities would not have rendered a different result probable upon retrial since it was highly speculative. The jury was fully aware at trial of the dispute between Mortensen and Brady. We conclude that the introduction of Ramirez's background does not make Brady's testimony any more or less credible.

Finally, the evidence must be "not only an attempt to contradict, impeach, or discredit a former witness, unless the witness is so important that a different result would be reasonably probable."

[FN 7] *Sanborn*, 107 Nev. at 406, 812 P.2d at 1284.

The evidence relating to Ramirez's background is being used in such an attempt and, while Ramirez is an important witness, we conclude that this information about his background would not make a different result more reasonably probable upon retrial.

At trial, Ramirez testified that he was about thirty-five to forty feet from Brady's truck at the time of the shooting. He also testified that he was standing outside smoking a cigarette less than fifteen feet from the victim. Ramirez further testified that the shooter was laughing and described him as "more than six feet tall." In addition, Ramirez testified that he got a good look at the passenger, that it was not possible that the driver had fired the gun and there was no question in his mind who had fired the gun. Ramirez identified Mortensen as the shooter.

The State called several eyewitnesses at trial. Five witnesses gave similar descriptions of the shooter, describing him as a large, white male who wore glasses and was the passenger in the truck.

[FN 8] *See Mortensen*, 115 Nev. at 278, 986 P.2d at 1108.

Another witness, Eduardo Rodriguez, identified Mortensen as the shooter. In summary,

It was established that Mortensen was six feet, two inches tall and weighed 220 pounds, while Brady was five feet, nine inches tall and weighed 165 pounds. It was also established that Mortensen wore glasses on the night of the shooting. No witnesses identified Brady or anyone else as the shooter.

[FN 9] *Id.*[ ] at 278, 986 P.2d at 1109.

Furthermore, forensic evidence also implicated the defendant. A forensic expert delivered expert testimony that was consistent with the testimony of five eyewitness[es]. Thus, the jury considered evidence in addition to Ramirez's testimony regarding whether Brady or Mortensen was the shooter.

The introduction of evidence that Ramirez was involved in drug activity or other criminal behavior does not change the fact that Ramirez saw the shooting and identified Mortensen as the shooter. Furthermore, Ramirez was not the only witness who identified Mortensen as the shooter. The jury was aware of Ramirez's gang affiliation, and the additional evidence concerning his background does not make it more probable that the jury would find that Ramirez and the other witnesses were mistaken in identifying Mortensen as the shooter.

For these reasons, evidence of Ramirez's drug activity and criminal behavior is unlikely to lead to a different result on retrial. Therefore, we conclude that the district court did not abuse its discretion when it denied Mortensen's motion for a new trial based on newly discovered evidence.

ECF No. 176-2 at 13–15.

**c.     Analysis of Allegations in Ground II(C)**

**i.     Ground II(C)(1)—Pretrial Criminal History**

The NSC addressed the suppression component of the *Brady* claim for Ramirez's pretrial criminal history by determining the information could have, with the exercise of reasonable diligence, been discovered and produced for trial. *See supra* at p. 46. The NSC's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented in the state court proceeding.

The defense was aware that Ramirez was an 18th Street gang member. *See supra* at p. 9. Thus, the defense was on notice that a search of the public records could reveal some of Ramirez's pretrial criminal history, including his (1) misdemeanor conviction for driving on September 29, 1996, in violation of instruction permit, and his (2) April 23, 1997, guilty plea to a gross misdemeanor charge of conspiracy to commit burglary. *See supra* at pp. 45–46. Moreover, defense counsel testified that he was aware of the robbery plea and the unregistered firearm charges which led to a plea to a reduced charge of driving in violation of instruction permit. ECF No. 176-3 at 193. The defense could have reasonably uncovered Ramirez's April 25, 1997, citation for possession of a bludgeoning device as records indicate a court date was scheduled for shortly after Mortensen's trial—in May of 1997. *See supra* at p. 46. Finally, the defense could have uncovered the February 23, 1997, complaint for domestic violence through a records search as an arrest warrant was requested on April 17, 1997, in Case No. 97M07358X. *See supra* at p. 45.

Accordingly, fairminded jurists would agree those four pretrial cases were not suppressed, and therefore that information does not give rise to a *Brady* violation. Mortensen is not entitled to relief based on the allegations in Ground II(C)(1).

**ii.     Ground II(C)(2)—Methamphetamine Distribution**

The NSC's determination that Ramirez's pretrial drug activity, which ultimately led to a federal criminal case after Mortensen's trial, was immaterial, is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact.

48

Mortensen contends the information about Ramirez selling drugs to an undercover agent would have impeached Ramirez's testimony that, at the time of the shooting, he had not been drinking or doing drugs and none of the people outside the apartment had a gun. ECF No. 176 at 75. Mortensen speculates the evidence of the drug distribution, together with testimony that two of the eyewitnesses identified Mortensen and Brady as "narcs," Mendoza had methamphetamine— the same drug Ramirez was caught distributing—in his system, Ramirez's previous arrest for possession of an unregistered firearm, and that Ramirez's robbery arrest included theft of beer, would have provided circumstantial evidence that Ramirez was supervising a drug distribution ring at the time of the shooting and therefore had a bias in favor of law enforcement and a motive to fabricate testimony that supported the State's theory of the case. *Id.* Mortensen also contends the information was material because, as the sole witness identifying Mortensen as the shooter, it would have impeached Ramirez's credibility. *Id.* at 68, 75.

As explained, to prevail on a *Brady* claim, a defendant must show there is a reasonable probability the result of the trial would have been different if the suppressed evidence had been disclosed to the defense. *See Strickler*, 527 U.S. at 289–90. "'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.'" *Agurs*, 427 U.S. at 109–10.

As the NSC stated, Ramirez's drug activity, even combined with other evidence, fails to establish Ramirez was selling or using drugs or drinking alcohol on the night of the shooting, or that anyone present possessed a firearm. Such speculation is insufficient to establish a reasonable probability the result of the trial would have been different had the drug distribution activity been disclosed to the defense. Moreover, Ramirez's background does not make his testimony about what he saw at the time of the shooting more or less credible and does not make it more probable that the eyewitnesses were mistaken about their identifications. The record supports the NSC's determination that Ramirez was not the only witness to identify Mortensen as the shooter. *See supra* at pp. 9–10. Mortensen is not entitled to federal habeas relief on Ground II(C)(2).

**5.     Collective Consideration of the *Brady* Claims**

The record of the NSC's decisions, concerning the *Brady* claims that were presented to that

court, demonstrate the claims were considered collectively. ECF Nos. 38-1 at 16–21; 40; 44-6 at 4. As explained, *Brady*/*Giglio* claims are evaluated collectively, after a court first evaluates the tendency and force of each item of suppressed evidence. *See supra* at p. 26. The State violated *Brady* by suppressing Barry's favorable and material testimony to the defense. The State did not violate *Brady* by suppressing evidence related to Morris or Ramirez's pretrial criminal history. And Ramirez's drug trafficking activities are immaterial. Mortensen is thus not entitled to federal habeas relief based on a collective analysis of his *Brady* claims; he is entitled only to habeas relief based on Ground II(A).

### C.   Ground III—IAC

Mortensen alleges trial counsel was ineffective because counsel failed to locate and personally interview Barry and Morris, and instead relied upon the prosecutor's representations, which turned out to be false. ECF No. 176 at 92–112. He further alleges counsel was ineffective in failing to investigate Ramirez's criminal history. *Id.* Respondents argue the allegations are belied by the record and the *Strickland* claim fails on the merits. ECF No. 218 at 61–65.

#### 1.   Standards for Ineffective Assistance of Counsel (IAC)

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). An IAC claim requires a petitioner demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694. "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *Harrington*, 562 U.S. at 105 (internal citations omitted).

A petitioner who makes an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S.

at 690. A court considering an IAC claim, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. In considering IAC claims, a court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. "In making that determination, the court should keep in mind that counsel's function as elaborated in prevailing professional norms, is to make the adversarial testing process work," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

In establishing there is a reasonable probability the result of the trial would have been different, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen*, 563 U.S. at 189. A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687–88.

### 2.    State Court's Determinations

On appeal from denial of the first motion for new trial, the NSC made a factual finding that defense counsel exercised due diligence in investigating Barry's testimony:

> We conclude that this evidence was not discoverable with reasonable diligence. Defense counsel received an anonymous phone call during the trial, which roughly suggested the contents of Brady's statements to Barry. However,

Barry denied knowledge of any such statements when contacted by an investigator retained by the defense. Barry also denied knowledge of the statements when contacted by the district attorney. Thus, Mortensen exercised due diligence but was unable to confirm whether Barry had knowledge of any such statements made by Brady.

*Mortensen v. State*, 115 Nev. 273, 286–89, 986 P.2d 1105, 1113–16 (1999). On appeal from the denial of the state postconviction petition, the NSC determined counsel not ineffective:

Mortensen claims his trial counsel was ineffective. To state a claim of ineffective assistance of counsel sufficient to invalidate a judgment of conviction, a petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defense such that there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). While we independently review a claim of ineffective assistance of counsel, *State v. Love*, 109 Nev. 1136, 1138, 865 P.2d 322, 323 (1993), the "purely factual findings" of the district court "are entitled to deference . . . on review," *Riley v. State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994).
. . . .
Mortensen argues that trial counsel was ineffective for failing to investigate the eyewitnesses to the crime and Brady's background and for proceeding to trial only four months after the crime. He failed to demonstrate that counsel's performance was deficient or that he was prejudiced. The record supports the district court's findings that trial counsel conducted an effective investigation and had tactical reasons for proceeding to trial quickly.
. . . .
Furthermore, because this court has already determined that none of the evidence discovered later would have been reasonably likely to change the results of trial, *see Mortensen*, 115 Nev. at 286–289, 986 P.2d at 1113–1115; *Mortensen*, Docket No. 35316 (Order of Affirmance, October 5, 2001), at 3–5, Mortensen failed to show prejudice.

ECF No. 176-2 at 6–7. *See also supra* pp. 33–35, 47–48.

### 3.    Analysis of Ground III

#### a.    Ground III(A)—Investigate and Interview Barry

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. 668. The Ninth Circuit has held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *See, e.g.*, *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003) (citing *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (quoting *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)). *See also Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir. 1999) (holding deficient the failure to interview three witnesses who had

1    material evidence of client's innocence). "A witness's testimony consists not only of the words he

2    speaks or the story he tells, but also of his demeanor and reputation." *Lord*, 184 F.3d at 1095.

3        At the postconviction evidentiary hearing, trial counsel testified Brady's drive-by shooting

4    remarks "would have been so powerful" and could have led to acquittal, but counsel "personally

5    did not contact [Barry]," rather, his "investigator," Don Dibble, contacted him, and Barry "denied

6    it." ECF No. 176-3 at 183. Dibble was a former homicide detective who worked for Metro for 20

7    years. *Id.* at 88. Counsel was also informed Barry denied the allegations to the State. Under the

8    circumstances, the failure to continue the investigation or directly contact Barry did not fall below

9    an objective standard of reasonableness. As the NSC's determination does not constitute an

10   unreasonable application of *Strickland's* performance prong, Ground III(A) is denied.

### b.    Ground III(B)—Investigate and Interview Morris

12       Mortensen did not present to the state courts a *Strickland* IAC claim for failing to

13   investigate Carye Morris. ECF Nos. 41; 41-1; 41-2; 41-3; 44-1 at 10; 44-2; 44-3. Accordingly, the

14   NSC did not address such a claim. *See supra* at p. 52.

15       Respondents previously moved to dismiss this claim as unexhausted. ECF No. 185 at 10–

16   11. The Court denied the motion as the NSC incorporated its earlier decision affirming the denial

17   of the motion for new trial based on a claim that new evidence established Morris would testify

18   she heard Brady call himself "evil." ECF No. 212 at 9–10 (citing 38-1 at 16; 40 at 34). Further

19   review of the state-court record shows Mortensen did not fairly present or exhaust any *Strickland*

20   IAC claim related to an investigation of Morris. Accordingly, this claim is procedurally defaulted.

21       The Court has reviewed the briefs and has confirmed Mortensen did not claim he can

22   establish cause and prejudice to overcome the procedural default of this claim under *Martinez v.*

23   *Ryan*, 566 U.S. 1 (2012). ECF No. 176; 199; 225. Because "the interests of comity and federalism

24   will be better served by addressing the merits forthwith" than "by requiring a series of additional

25   state and district court proceedings before reviewing the merits," the Court reviews the claim *de*

26   *novo*. *See Granberry*, 481 U.S. at 134.

27       At trial in May of 1997, defense counsel received a telephone call from Morris about her

28   allegations of sexual assault against Brady and defense counsel spoke with Morris but did not call

her as a witness. *See supra* at pp. 43. At the state postconviction evidentiary hearing, defense counsel stated Morris contacted him during the trial, and counsel speculated Morris was prompted to call because Mortensen testified that Brady said he conducted the shooting because he is "evil." ECF No. 43-3 at 36–38. According to the District Attorney, defense counsel informed the prosecutor that, after contacting Morris during trial, defense counsel was not interested in calling Morris as a witness. ECF No. 22-3 at 29. According to the District Attorney, Morris told IAB that when defense counsel contacted Morris, she told counsel Mortensen was as bad as Brady. *Id.* Although defense counsel had additional conversation with Morris posttrial in which she revealed that Brady had described himself as "evil," Morris's failure to mention that remark in her initial conversation with counsel does not render counsel's performance deficient.

There is also no reasonable probability Morris's information would have changed the outcome of the trial. Morris's testimony that Brady remarked that he is "evil," was favorable as it supported Mortensen's testimony and defense; however, Morris was not a witness to the shooting. The remark bespeaks hyperbole. And the remark does not suggest Brady was the shooter as it occurred a few months before the shooting. Additionally, there is evidence suggesting Morris's testimony about the sexual assault would have lacked credibility and would not have been favorable to Mortensen. For example, Morris told IAB that when she was arrested by Brady, Mortensen arrived as a backup officer and searched her car, found clothes bearing price tags, asked if she was a shoplifter, and after she told him the receipt was inside the bag with the clothes, Mortensen replied, "the receipt could disappear." ECF No. 22-3 at 28. Although it is true that the prosecutor misrepresented during trial that Morris had failed multiple polygraph examinations, the reality does not lend credibility: she failed to appear for two, aborted one, and her fourth attempt resulted in a polygraph that indicated deception. *Id.* at 32.

Counsel's performance was neither deficient nor prejudicial under *Strickland*. Ground III(B) is dismissed as procedurally defaulted and without merit.

### c.    Ground III(C)—Investigate Ramirez's Criminal History

The NSC reasonably applied *Strickland's* prejudice requirement in its determination that there is no reasonable probability that evidence of Ramirez's drug distribution activity would have

changed the outcome of the trial. *See supra* at pp. 46–50. *See also Gonzalez v. Wong*, 667 F.3d 965, 977 (9th Cir. 2011) n.7 ("The analysis of materiality for ineffective assistance of counsel is the same as the analysis of prejudice for *Brady,* so [the] *Brady* prejudice analysis applies directly to this ineffective assistance of counsel claim.") (citing *Bagley*, 473 U.S. at 682).

The NSC also reasonably applied *Strickland's* prejudice prong to Ramirez's pretrial criminal history. *See supra* at p. 52. Ramirez's criminal history would not have made him less credible in his testimony about what he saw on the night of the shooting as none of his criminal history bore directly or indirectly on his veracity. The jury was aware that Ramirez was an 18th Street gang member, and his testimony was largely, if not entirely, cumulative. Accordingly, Mortensen is not entitled to habeas relief based on the allegations in Ground III(C) of the Petition.

### d.     Consideration of IAC Claims as a Whole

Although IAC claims are examined separately to determine whether counsel was deficient, *Strickland* instructs the purpose of the Sixth Amendment's guarantee of counsel is to ensure "[c]riminal defendants receive a fair trial," "a defendant has the assistance necessary to justify reliance on the outcome of the proceeding," and counsel's assistance was "reasonable considering all the circumstances." *See Strickland*, 466 U.S. at 689, 692; *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) ("While an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' . . . the court considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate.") (internal citation omitted) (emphasis in original).

On appeal from the denial of the state postconviction petition, the NSC determined Mortensen's IAC claims do not warrant relief cumulatively:

> Mortensen's claim of cumulative error at trial is procedurally barred because it could have been raised previously and he has failed to show good cause or prejudice. *See* NRS 34.810(1)(b). And based on the foregoing discussion of Mortensen's claims of ineffective assistance of counsel, we conclude that any deficiencies in counsels' performances in this case, when considered either individually or cumulatively, do not warrant relief. *See Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002).

ECF No. 176-2 at 9–10.

Considering the merits of Mortensen's IAC claims taken together, the NSC was objectively reasonable in its determination that Mortensen has not demonstrated counsel's conduct as a whole was deficient and has not demonstrated multiple deficiencies that collectively resulted in prejudice. Mortensen has not shown inadequate assistance of counsel denying him due process or a fair trial and is not entitled to habeas relief when considering his IAC claims collectively.

### D.    Ground IV—Preservation of Evidence

Mortensen alleges the State failed to collect and preserve Brady's truck, thereby allowing the destruction of potentially exculpatory evidence in violation of due process. ECF No. 176 at 113–116. In support of his argument Mortensen only points to the removal of the window tint and the adjustment to the clutch and carburetor. *Id.* Respondents argue the NSC's rejection of this claim is neither contrary to nor constitutes an unreasonable application of Supreme Court authority and is not based on an unreasonable determination of fact. ECF No. 218 at 66–71.

### 1.    Standards for Evaluating Preservation of Evidence

In *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court considered whether Due Process requires the state preserve potentially exculpatory evidence on behalf of defendants. *Id.* at 481. The Court concluded the failure to preserve breath samples did not violate due process because officers did not destroy the samples "in a calculated effort to circumvent the disclosure requirements established by" *Brady*; rather, they acted "'in good faith and in accord with their normal practices . . ..'" *Id.* at 488 (quoting *Killian v. United States*, 368 U.S. 231 (1961)). The Supreme Court concluded that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488. "To meet this standard of constitutional materiality . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489 (internal citation omitted).

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court considered "the extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant." *Id.* at. 52. The Court held that

"[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *Id.* at 56 n.* (citing *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)).

"Potentially useful evidence, as defined in *Youngblood*, is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) (quoting *Youngblood*, 488 U.S. at 57). In *Youngblood,* the Court distinguished between intentional misconduct that amounts to bad faith and negligent behavior that does not. *Youngblood*, 488 U.S. at 57. The existence of a pending discovery request does not eliminate the necessity of showing bad faith on the part of the police. *See Illinois v. Fisher*, 540 U.S. 544, 548 (2004).

## 2.    Additional Background

Metro Sergeant Manning testified that, before receiving the call from Brady's father that his son was involved as the driver of the vehicle for the shooting, the police had no suspects for the case. ECF No. 176 at 11. Brady told the homicide detectives that Mortensen pointed his gun out the window and Brady reacted and "pulled [his gun] up and stuck it out of the window," however, it was Mortensen who fired the shots. *See supra* at p. 2. Detectives Becker and Bigham suggested they conduct a walk-through booking for Brady as an accessory to the crime, but Metro decided not to arrest Brady because he was considered a witness, not a suspect. *See supra* at p. 7.

A Metro criminalist processed the truck in the early morning hours of December 30, 1996, but as instructed by a homicide detective, the criminalist processed only "[t]he passenger side" of the truck, and "did not" process "the driver's side" of the truck "at all." ECF No. 176-5 at 118–19, 128. The truck was returned to Brady a day or two later. *See supra* at p. 7.

Also on December 30, 1996, Becker conducted eyewitness viewings of two six-pack photo line-up arrays, one with Mortensen and one with Brady. ECF No. 176-6 at 195–97. Ramirez told Detective Becker he was not sure, based on the photographs, because the photographs could have

been taken "some time back," but, after having viewed Mortensen's photograph in the array, he identified Mortensen in a physical lineup conducted the next day. *Id.* at 10–13. Martinez identified Mortensen and Brady in the photographs but, the next day during a physical lineup, he narrowed his choices to Mortensen and another individual, and chose the other individual. ECF No. 176-5 at 160–66, 177–78, 200. Zurita did not identify anyone in the photographic arrays, but during the physical lineup, she narrowed her selection to Mortensen and another individual, and chose the other individual. ECF No. 176-6 at 130–34. Rodriguez did not select a suspect from the photographic lineup arrays and did not attend the physical lineup. ECF No. 176-6 at 63, 88–89. Lujan did not testify about participating in any lineups. *Id.* at 35–62.

On January 10, 1997, defense counsel wrote a letter to the District Attorney stating that, based on counsel's information, Brady "is capable of the conduct that is now being ascribed by him to" Mortensen, indicated answers to certain questions posed to witnesses, including Brady, would exonerate Mortensen, and questioned why Brady was not included in a physical lineup, why Brady's clothing was not impounded and examined for powder residue, and why Brady's father was not interviewed. ECF No. 176-2 at 79.

At a hearing in Justice Court on January 15, 1997, defense counsel requested access to Brady's truck, but the Justice Court lacked jurisdiction over Brady's property, and the justice court requested the State ask Brady not to destroy any evidence. *Mortensen v. State,* 115 Nev. 273, 277, 986 P.2d 1105, 1108 (1999); ECF No. 176-4 at 5–8. In state district court on January 23, 1997, counsel again requested access to Brady's truck, but the State did not have it. *Id.* at 212–13. The court denied the request telling counsel to obtain access to the truck on his own. *Id.*

On January 24, 1997, Brady had his truck painted out of concern over retaliation, and after asking Deputy District Attorney Lukens, Lieutenant Peterson, and his attorney, "if it would be okay." ECF No. 176-7 at 180. He removed the tint from all but the rear window, replaced the custom seat that had the center console with the hidden compartment, with the original bench seat because the custom seat did not fit as well, and he needed the cash. *Id.* at 182–83.

On February 4, 1997, the defense moved to compel Brady's deposition, and produce his truck. ECF No. 20 at 7–8. On February 13, 1997, the defense confirmed it received the truck, but

the truck was repainted, and the front seats replaced. *Id.* at 24. The State advised that photographs of the original seats and truck paint would be provided to the defense. *Id.* The state district court denied the motion but instructed the State to provide the identity of the individual who repainted the truck and changed the seats. *Id.* On February 19, 1997, the defense moved for reconsideration of the denial of the motion to compel Brady's deposition arguing Brady had repainted the interior of the cab and replaced the carpet and bench seat. ECF No. 20-1 at 3–4. At the hearing on the motion, the state district court stated, "it bothers me why this truck wasn't impounded and kept," and granted the motion. ECF Nos. 20-2 at 33–34; 20-3 at 12–14. The record suggests that in April of 1997, Metro determined "six cartridge cases," and three bullets found at the scene "were fired" from Mortensen's gun. ECF No. 176-8 at 55-56, 59, 79-81.

At trial on Thursday, May 1, 1997, the state district court directed the State to make "every effort over the weekend to get that [truck] back in the same condition it was on . . . the morning of December 28, 1996," stated that the defense investigator could be present, and stated the State must notify the defense when the restoration is complete. ECF Nos. 21-1 at 5; 27 at 4–6. The trial court ruled, "whether or not any evidence will be admitted from that exhibit will depend on argument before the court." *Id.* Metro Crime Scene Analyst Ford testified that, for purpose of trial, the custom seat was obtained and reinstalled in the truck, and the original bench seat was reinstalled in the back of the pickup truck, to replicate its configuration on the night of the shooting. ECF No. 29-1 at 43–45.

The following Monday, May 5, 1997, the truck was made available to the defense. ECF No. 29 at 4–5. On May 6, 1997, the parties stipulated to the admission of the truck into evidence and the jury viewed the truck at the crime scene. ECF Nos. 30-1 at 2–3; 31 at 16–17.

Brady testified at trial he tried to "take off before the shot was fired," but his truck "acted like it had a flat on it, started to go," and the truck "ha[d] a flat stall in it when I stepped on the pedal and tried to go." ECF No. 176-7 at 158. He explained that when that happened, "[b]asically where you get an initial jolt from the vehicle, then it just stalls itself and kind of drives the vehicle forward, then it starts to go once it catches power again." *Id.* at 159. He said his truck started to go "just a little bit" and was moving when shots fired. *Id.* Brady replaced the carburetor because it

was recommended by a smog tech who told him it would not pass inspection without it. ECF No. 176-8 at 16. Brady had the truck "tuned up," as he "had to work on the transmission due to the fact that the transmission wasn't catching," and he adjusted the "fly clutch on the fan." *Id.*

Defense investigator Dibble testified that when he removed his foot from the brake, the truck began "to move forward." ECF No. 176-9 at 107. Because the carburetor was rebuilt since the shooting, the trial court sustained an objection to testimony that "there was no measurement of time distance, but it is a noticeable and near-immediate acceleration." *Id.* at 107–08.

### 3.    State Court's Determination

On direct appeal, the NSC determined Mortensen failed to establish the police acted in bad faith when they returned the truck to Brady because, at the time, the State did not consider Brady a suspect, nor did it know that Mortensen would contend Brady was the shooter:

> Mortensen argues that his due process rights were violated by the State's failure to preserve evidence and provide evidence subject to discovery. Thus Mortensen claims the case should be reversed and the charge dismissed. Specifically, Mortensen contends that the State should have acquired Brady's truck and clothing and provided them to Mortensen before they could be altered. This argument is without merit.

> To establish a violation of due process "'resulting from the state's loss or destruction of evidence, a defendant must demonstrate either (1) that the state lost or destroyed the evidence in bad faith, or (2) that the loss unduly prejudiced the defendant's case and the evidence possessed an exculpatory value that was apparent before the evidence was destroyed.'" *Sheriff v. Warner*, 112 Nev. 1234, 1239–40, 926 P.2d 775, 778 (1996) (quoting *State v. Hall*, 105 Nev. 7, 9, 768 P.2d 349, 350 (1989)); *see also Daniels v. State*, 114 Nev. 261, 267–68, 956 P.2d 111, 115 (1998).

> Mortensen fails to show that the State acted in bad faith when it failed to provide Brady's truck or clothing to Mortensen. The LVMPD obtained Brady's truck shortly after the shooting, conducted an examination, took pictures and returned the truck to Brady. At that time, the State did not consider Brady a suspect, nor did it know that Mortensen would contend that Brady was the shooter.

> [FN 7] Mortensen claims that the State was notified of the defense theory by way of a letter written to the State in January of 1997. However, the January letter does not appear in the record.

> Mortensen also claims that a motion in limine filed by the State on March 31, 1997, showed that the State was aware of the defense's theory. Even if the motion did show that the State was aware of Mortensen's theory, it would only show that the State was on notice at the end of March, but not that the State was on notice in January, when the truck was examined. Thus, the statement does not demonstrate that the State was aware of Mortensen's theory at the time the evidence was altered.

Thus, the LVMPD was not required to provide the truck or the clothing to Mortensen.

Mortensen also argues that the State acted in bad faith by ignoring a justices' court's request, at a bail hearing, that the State not destroy any evidence. However, the justices' court did not order the State to produce the truck and clothing, it merely requested that the State ask Brady not to destroy evidence. Additionally, the justices' court correctly stated that it did not have jurisdiction over Brady's property. *State of Nevada v. Justice Court*, 112 Nev. 803, 806, 919 P.2d 401, 402 (1996) (concluding that "the justice[s'] court does not have the authority to order criminal discovery prior to a preliminary hearing"). The bail hearing took place on January 15, 1997, and the preliminary hearing was scheduled for January 24, 1997. Thus, the justices' court did not have jurisdiction to grant the relief sought by Mortensen.

For these reasons, we conclude that the State did not act in bad faith when it did not preserve and provide Brady's truck and clothing to Mortensen.

[FN 8] The significance of any perceived failure by the State to preserve this evidence and any inference arising therefrom was more than adequately conveyed to the jury.

Furthermore, Mortensen has failed to demonstrate that he was unduly prejudiced by any alterations made to Brady's truck or clothing.

[FN 9] Mortensen also argues that his conviction should be reversed pursuant to *Cook v. State*, 114 Nev. 120, 953 P.2d 712 (1998). In *Cook*, we reversed a defendant's conviction for sexual assault where the police had lost a substantial amount of evidence, including all photographs of the crime scene and the victim's sweater. The police also failed to collect the victim's pants, which were allegedly torn during the assault. Because the police in the present case have not actually lost any evidence, *Cook* is not applicable, and Mortensen's argument is thus without merit.

To establish prejudice, Mortensen "must show that it could be reasonably anticipated that the evidence would have been exculpatory and material to the defense." *Leonard v. State*, 114 Nev. 639, 654, 956 P.2d 1220, 1232 (1998) (citing *Boggs v. State*, 95 Nev. 911, 913, 604 P.2d 107, 108 (1970)).

Although the custom bench seat present in the truck on the night of the shooting was removed and sold by Brady, Mortensen was able to acquire the seat and place it in the truck for the trial. The jury was able to observe the truck with the custom seat, and jury members were allowed to sit in the truck. Thus, they could assess the credibility of Brady's statement that he could not reach across the cab sufficiently to have discharged Mortensen's weapon as described by eyewitnesses.

[FN 10] At trial, it was undisputed that Mortensen's weapon fired the fatal shot.

Mortensen has, therefore, not demonstrated that the custom seat, prior to its removal, possessed an exculpatory value any greater than was apparent from the reinstalled seat. Thus, the removal and subsequent reinstallation of the custom seat did not prejudice Mortensen.

Although Brady's truck was repainted after the shooting, there was never a dispute that Brady's truck was the vehicle from which the shots were fired. Thus, the repainting of the truck did not prejudice Mortensen.

Similarly, the removal of the window tint did not prejudice Mortensen since the eyewitnesses to the shooting observed the shooter either through the rolled down passenger window or through the untinted, front window.

Mortensen argues that the adjustment of the clutch and carburetor prevented him from demonstrating that the truck, if left in gear, would roll forward if the driver's foot were removed from the brake, i.e., if Brady's foot came off the brake while he leaned across the truck cab to fire out the passenger window. However, Mortensen established this proposition at trial when a defense investigator testified that Brady's truck would roll forward if the driver removed his foot from the brake. In any case, both the State's and the defense's theories relied on the movement of the truck. The State argued that Brady began to drive once Mortensen fired his gun, while the defense argued that the truck moved when Brady leaned over to shoot. Since the jury heard testimony regarding the tendency of the truck to move when the brake was released, we conclude that Mortensen was not unduly prejudiced by the adjustment of the carburetor and clutch.

[FN 11] The district court sustained the State's objection when Mortensen attempted to establish how quickly the truck would move if the brake were released. At no other time during the trial did Mortensen attempt to establish the truck's rate of acceleration. Further, both the State and defense theories relied on the movement of the truck. The fact that the truck moved, not how fast it moved, was relevant to both parties. Thus, Mortensen was not unduly prejudiced when the court refused him permission to establish the rate of acceleration.

ECF No. 176-2 at 26–30.

### 4.    Analysis of Ground IV

There is clear and convincing evidence in the state-court record that the NSC's determination that there is no bad faith on the part of the State because the record does not include a January 10, 1997, letter from defense counsel notifying the State that Mortensen claimed Brady was the shooter, and the State was unaware until March of 1997 that Mortensen would claim Brady was the shooter, is based on an unreasonable determination of fact. 28 U.S.C. § 2254(d)(2); (e)(1).

A review of the state-court record reveals that defense counsel's January 10, 1997, letter to the District Attorney was clearly and convincingly admitted into evidence during defense counsel's testimony at the June 29, 2007, state postconviction evidentiary hearing. Defense counsel testified that he wrote to the State two days after he was retained, on January 10, 1997, and "told them that Brady was the probable shooter, that they ought to look at him." ECF No. 43-4 at 5; 43-5 at 36–38; 176-3 at 165–66. The January 10, 1997, letter was admitted into evidence as part of "Exhibit 1," which consisted of defense counsel's correspondence file. ECF No. 176-3 at 204–08, 233–36. An evidence sticker for Exhibit 1 dated June 29, 2007, appears on the first page

of several letters written by defense counsel, including the January 10, 1997, letter to the District Attorney. *See* ECF No. 176-2 at 77-80. Thus, the NSC's determination that the State's actions were not conducted in bad faith is based on an unreasonable determination of fact by clear and convincing evidence in the state court record. 28 U.S.C. § 2254(d)(1); (e)(1). Accordingly, the remainder of the claim is reviewed *de novo*.

By virtue of the January 10, 1997, letter, the State was on notice that the truck could have some significance to the defense. Counsel's letter states, among other things, that based on counsel's information, Brady "is capable of the conduct that is now being ascribed by him to my client." ECF No. 176-2 at 79. The letter queries why Brady was not included in a physical lineup, why Brady's clothing was not impounded and examined for powder residue, and why Brady's father was not interviewed, but does not mention the truck. *Id.*

The State did not act in bad faith by returning the truck to Brady before January 10, 1997, because the record demonstrates the police had evidence to suspect Mortensen was the shooter: Brady's statement, some corroboration from the eyewitnesses, plus Mortensen's Sig Sauer. However, after that date, the State was on notice of the significance of the truck as evidence. Instead of immediately retrieving the truck in January, the State told Brady he could repaint the truck and Brady repainted on January 24, 1997, and made other modifications. *See supra* at p. 58. When the State retrieved the truck in February of 1997, the defense had access to it on February 13, 1997, but the truck was entirely repainted inside and out, the tint removed from the passenger and driver side windows, and the carpet and bench seat replaced. The record, however, fails to indicate when Brady replaced the carburetor or adjusted the clutch.

Although the State's actions in failing to preserve the evidence were to some extent conducted in bad faith because once the State was aware of the defense theory, the State did nothing to preserve the truck as evidence and instead allowed changes to be made to the truck, Mortensen fails to demonstrate changes to the window tint, carburetor, and clutch were exculpatory or potentially exonerating or useful to him at trial. *See Youngblood,* 488 U.S. at 58.

First, there is no evidence or argument that persuasively suggests tests conducted on the original truck carburetor and clutch would lead to potential exonerating or useful evidence. Brady

testified at trial that, at the time of the shooting, his truck would stall when he pressed on the gas pedal. He testified that, at some point, he changed or adjusted the clutch and carburetor. He did not indicate whether he did so before or after the defense viewed the truck in February of 1997. Mortensen's investigator testified that he tested the truck at the time of trial and found that when he released the brake, the truck moved forward—presumably without pressing the gas pedal—but there is no evidence the brakes were replaced. Both sides argued the truck was moving when shots were fired and that is possible regardless of whether the shooter was Brady or Mortensen. In other words, it is conceivable that Brady could have fired shots while having removed his foot from the brake, which could have caused the truck to move forward, or by stepping on the gas pedal, which would likewise move the car forward based on Brady's testimony. Mortensen has failed to establish a reasonable basis to conclude the failure to preserve the original carburetor and clutch would have been useful or, if tested, would lead to exonerating results. Second, Brady testified his truck had tinted windows except for the front windshield. The eyewitnesses did not notice Brady's activities even though the front windshield was not tinted. Although the passenger window was tinted, they saw Mortensen and the gun through the open passenger window. Mortensen fails to show the failure to preserve the tinted windows destroyed useful evidence for the defense.

For the foregoing reasons, Mortensen is not entitled to habeas relief on Ground IV.

## IV.    Ground V—Cumulative Error

Mortensen alleges cumulative errors violated his due process rights and rendered his trial fundamentally unfair because the combined effect of multiple trial errors rendered the defense far less persuasive than it might have been, and therefore had a substantial and injurious effect or influence on the jury's verdict, violating due process. ECF No. 176 at 117. Respondents argue Mortensen has procedurally defaulted Ground V, and assuming he can overcome the default, he cannot demonstrate the denial of the remaining portion of Ground V involved an unreasonable application of clearly established federal law because there is no clearly established federal law on cumulative error and this Court should denied Ground V in its entirety. ECF No. 218 at 71–74.

"[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

2007). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973). *See also Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) ("We have granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case.").

Mortensen did not raise a cumulative error claim on direct appeal from the denial of the motions for new trial. ECF Nos. 38-1; 70; 40 at 34–37; 50-1. In his state habeas petition and in his appeal from the denial of the petition, Mortensen presented a claim of cumulative error in violation of due process based on all the claims raised in the state habeas petition and based on trial errors raised in the motions for new trial that were considered on direct appeal. ECF No. 41-3 at 12–13; 44-3 at 4–7.

On appeal from the denial of the state postconviction petition, the NSC determined:

> Mortensen's claim of cumulative error at trial is procedurally barred because it could have been raised previously and he has failed to show good cause or prejudice. *See* NRS 34.810(1)(b). And based on the foregoing discussion of Mortensen's claims of ineffective assistance of counsel, we conclude that any deficiencies in counsels' performances in this case, when considered either individually or cumulatively, do not warrant relief. *See Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002).

ECF No. 176-2 at 9–10.

This Court previously dismissed Ground V "to the extent it incorporates Ground IV" as that claim was raised on direct appeal and was not the topic of a motion for new trial and therefore was not included in the cumulative error claim raised in the state habeas petition. ECF No. 212 at 10–11. Grounds II(B) and III(B), alleging violations of *Brady* and *Strickland* related to Morris, are excluded as those claims were not raised in the state habeas proceedings and were not included in the cumulative error claim. ECF Nos. 41-3 at 12–13; 44-3 at 4–7. Mortensen's trial error claims that were included in his cumulative error argument in the state habeas petition, based on the denials of the motions for new trial, are not included in the present cumulative error claim because they are not raised in the federal petition as violations of the federal constitution. In sum, Grounds I, II(A), II(C), III(A), and III(C) must be considered for the federal cumulative error claim.

The only claim that was procedurally defaulted was Ground I. As the Court determined, the NSC's procedural default for Ground I constitutes an objectively unreasonable application of clearly established federal law. The Court further determined that relief is warranted on Grounds I and II(A). Grounds I and II(A) amplify each other in relation to the key contested issue in the case: whether Mortensen or Brady fired the shot that killed Mendoza. However, because independent relief is granted for each of those grounds, they need not establish cumulative error. For the foregoing reasons, Ground V is denied.

## V.    Certificate of Appealability (COA)

Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," and for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id.* Applying these standards *sua sponte*, a COA is warranted on Grounds II(B) and III(B) as reasonable jurists could debate whether the courts procedural rulings are correct and Grounds II(C), III(A), III(C), IV, and V as reasonable jurists could find the Court's assessment of the constitutional claims debatable or wrong.

## VI.    Conclusion[13]

**IT IS THEREFORE ORDERED that:**

1. The Fourth Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 176) is conditionally granted as to Grounds I and II(A) and denied as to the remaining grounds. The state court's judgment of

---

[13] The Court notes that the parties made arguments and cited cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues.

conviction of Petitioner Ronald Lawrence Mortensen in Case No. CR140608X in the Eighth Judicial District Court of Nevada is hereby vacated. Within 120 days[14] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if affirmed; or (2) the expiration for seeking such appeal or review, Mortensen must be given a new trial.

2.  It is further ordered that a Certificate of Appealability is granted for Grounds II(B), II(C), III, IV, and V.

3.  It is further ordered that all requests for evidentiary hearing are denied.

4.  It is further ordered that the Clerk of Court is directed to (1) enter judgment accordingly; (2) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court of Nevada in connection with that court's Case No. CR140608X; and (3) close this case.

DATED: March 31, 2025

KENT J. DAWSON
UNITED STATES DISTRICT JUDGE

---

[14] Reasonable requests for modification of this time may be made by either party. *See* Fed. R. Civ. P. 59 and 60.